[No. B096420. Second Dist., Div. One. Nov. 27, 1996.]

DAVID MOHILEF, Individually and as Trustee, etc., et al., Plaintiffs and Appellants, v.
ROBERT JANOVICI et al., Defendants and Respondents.

COUNSEL

Jay S. Bulmash for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Claudia McGee Henry, Assistant City Attorney, and Michael L. Klekner, Deputy City Attorney, for Defendants and Respondents.

OPINION

MASTERSON, J.—This case presents the principal question of whether, in an administrative proceeding brought by a municipality to abate a public nuisance, the due process clauses of the state and federal Constitutions require that the offending property owner receive a full, judicial-type hearing.

We hold that due process is satisfied as long as the property owner receives adequate notice of the nature of the alleged nuisance and a meaningful opportunity to respond to the charges against him. It is not necessary that he receive the full panoply of procedural protections accorded in a judicial trial, such as the ability to cross-examine witnesses under oath, to subpoena witnesses, or to engage in discovery.

BACKGROUND

David and Monica Mohilef own a 7.5-acre ranch located within the gated community of Monteria Estates in the Chatsworth area of the City of Los Angeles (the City). The Mohilefs have lived on the property since purchasing it in 1977.[1] The ranch consists of a single-family dwelling, a barn, bird pens, an aviary shelter, and what the City describes as an "ostrich farm."[2] The properties adjoining the ranch are developed with two-story single-family dwellings.[3]

For at least four decades, David Mohilef (Mohilef) has been engaged in the business of importing, buying, and selling domestic and exotic animals.

[1]At some point in the 1990's, the Mohilefs transferred ownership of the property to the Mohilef Family Trust, which is a revocable inter vivos trust.

[2]The property is in an "A-1" agricultural zone, which permits (1) single-family dwellings, (2) parks, playgrounds, or community centers, (3) agricultural uses, including field crops, truck gardening, nurseries, orchards, aviaries, and apiaries, and (4) the keeping of domestic livestock, poultry, fowl, rabbits, fish, frogs and other small animals, provided, with certain exceptions, that the keeping of such animals is not for commercial purposes. (L.A. Mun. Code, § 12.05A.)

[3]Many of these properties are also located in an "A-1" agricultural zone. (See fn. 2, ante.)

He owns or has an ownership interest in several commercial entities that import, breed, and sell various animals and birds. Mohilef has participated with educational and research institutions throughout the world in researching genetics, the protection of endangered species, and ecological issues such as efficient land use, world hunger, and food production for the next century.

In 1994, Mohilef was involved with businesses related to ostriches and emus—birds belonging to a group known as ratites.[4] These business enterprises operated 12 separate facilities throughout Los Angeles County (other than the Mohilef ranch) to house and maintain ostriches and emus for commercial purposes. When birds were either born or brought into one of the commercial establishments with which Mohilef was involved, he sometimes selected the best of them from a genetic viewpoint and brought them to the ranch. There, he would watch their development, looking for traits that would improve the breed.

As of July 1994, Mohilef was attempting to develop a better quality bird and was researching the appropriate density at which ostriches and emus could be raised. Through his research, Mohilef hoped to show that the birds could be raised for food in a high density environment, saving valuable pasture land and rain forests. As Mohilef put it, "I'm trying to see how many I can raise on an acre where I'll get 65 to 75 pounds of prime meat [and] 14 square feet of hide." For that purpose, he maintained approximately 400 ostriches and 400 emus at the ranch. The birds were not owned by Mohilef directly, but by several commercial entities in which he had a minority interest. He received the birds while they were chicks and kept them until they were eight to ten months old, at which time they were shipped to one of his commercial facilities.[5] Mohilef did not receive any compensation for keeping the birds at the ranch or for the use of his property. His commercial enterprises paid for the care and feeding of the birds. A staff of 13 people

---

[4]Ratites comprise a group of flightless birds which, in addition to the ostrich and emu, include rheas, cassowaries, kiwis, elephant birds, and moas. (See Webster's Third New Internat. Dict. (1993) p. 1885, col. 3.) An ostrich is the largest existing bird, attaining a height of six to eight feet and a weight of three hundred forty-five pounds. (*Id.* at p. 1598, col. 2; 8 New Encyclopaedia Britannica (15th ed. 1988) p. 1037, col. 3.) An emu is slightly smaller than an ostrich, reaching a height of over five feet and a weight exceeding one hundred pounds. (Webster's Third New Internat. Dict., *supra*, p. 744, col. 3; 4 New Encyclopaedia Britannica, *supra*, pp. 482-483.) In contrast, a kiwi bird is about the size of a domestic chicken. (Webster's Third New Internat. Dict., *supra*, p. 1247, col. 3.)

[5]Ostriches reach sexual maturity at three years of age. For food purposes, they are generally slaughtered when they are nine months old.

were employed full time at the ranch to keep the property clean and sanitary and to tend to the birds and other animals.[6]

In May 1994, the Mohilefs received a notice from the office of the City zoning administrator, informing them that on July 11, 1994, a public hearing would be held concerning the operation of the ranch. The notice stated that the zoning administrator "may impose conditions regarding the use of the site as a commercial bird farm in order to mitigate any land use impacts caused by the use." The public was also invited to submit written comments before the hearing.

The notice further stated: "There have been allegations that commercial bird farming activities are being conducted at the subject location which . . . constitut[e] a public nuisance. The location has generated numerous complaints from residents of surrounding properties regarding the commercial raising and keeping of animals such as ostriches, emus, and llamas. These complaints include that there are approximately 600 ostriches at the location and that the animal waste generated has an overwhelming odor which permeates the area. Further, there is concern that the dried animal feces when pulverized become airborne and are deposited on adjacent properties which has resulted in physical damage and may harbor organisms which may cause illness in humans and/or animals."

Finally, as authority for the hearing, the notice stated, "[t]he Office of Zoning Administration has the authority to impose additional conditions on the operation of the commercial bird farm under Section 12.21-A, 15 (nuisance by any commercial or industrial use) of the Los Angeles Municipal Code."[7]

In a staff report dated June 6, 1994, the office of zoning administration described the complaints against the Mohilefs' bird farming activities and

---

[6]The ranch was also home to a number of goats, llamas, dogs, tropical birds, and donkeys.

[7]That section of the municipal code, commonly referred to as the nuisance abatement ordinance, authorizes the "modification or discontinuance of a commercial or industrial use if the Zoning Administrator finds that as operated or maintained such use: [¶] (1) Adversely impacts nearby agricultural, residential, or commercial uses *and* [¶] (2) Jeopardizes or endangers the public health and safety of persons residing or working on the premises or in the surrounding areas; *or* [¶] (3) Constitutes a public nuisance . . . ." (L.A. Mun. Code, § 12.21A.15(a), italics added.)

The procedure for adjudicating whether a particular use constitutes a public nuisance is fairly straightforward. First, the zoning administrator gives written notice to the affected property owner to show cause at a public hearing why the use should not be modified or discontinued. The notice states the time and place of the public hearing. A notice of the hearing is also mailed to the owners of all property located within a specified distance from the affected property. At the hearing, the zoning administrator takes evidence and thereafter issues a written decision. (L.A. Mun. Code, § 12.21A.15(b).) That decision may be appealed to the board of zoning appeals, which holds a public hearing after providing notice thereof in the same manner as the zoning administrator. (*Ibid.*; *id.*, § 12.28A.) The board renders a

the nature of the surrounding properties. In addition, the report noted that the office had received 11 letters opposing the presence of ratites on the Mohilef ranch. The report also commented that "[w]hen staff investigated the subject site the farm was relatively clean and well maintained . . . [and] the odor did not seem as pervasive as was stated in the complaint letters in the file."

Among the letters received by the office of zoning administration, one stated in part: "As a physician who lives in the area . . . , I am concerned about the stench and dust raised by 600 crowded ostriches on a small parcel of land. This fine dust can carry particles that will aggravate asthma and spread fungal illnesses such as coccidioidomycosis . . . ." Another letter commented that "the presence of these birds has changed my back yard from a pleasant garden and pool retreat into what looks like the bottom of a bird cage that hasn't been cleaned in weeks. No amount of daily care can keep the many thousands of feathers which blow my way from blanketing my yard, gardens, and pool." One couple wrote the zoning administrator, saying, "We cannot tolerate the outrageous stench from the animal waste that permeates our noses and throats, and causes us considerable discomfort and health risks."

On June 17, 1994, in connection with the upcoming public hearing before the zoning administrator, the Mohilefs filed a petition for writ of mandate in the trial court,[8] seeking to compel the City to issue witness subpoenas and to permit prehearing discovery.[9] The Mohilefs alleged that the due process clauses of the state and federal Constitutions (Cal. Const., art. I, § 7, subd. (a); U.S. Const., Amend. XIV) required such prehearing procedures. The trial court denied the petition for failure to exhaust administrative remedies.

On July 11, 1994, a public hearing was held before Associate Zoning Administrator Daniel Green (the AZA). At the beginning of the hearing, the AZA told the audience:

"Your job is to tell me what you think about the issues that are raised regarding the Mohilef Farms property. The purpose of the hearing is to get your input so that I can make a proper decision. If you're speaking in favor or in opposition to what's going on, you'll each have a chance to speak.

decision in writing, which may be appealed to the city council. (*Id.*, §§ 12.28A.8, 12.28A.9.) Like the board, the council (or its planning and environmental committee) conducts a public hearing after providing notice to the affected and surrounding property owners. (*Id.*, § 12.28A.9(e).) The council then renders its decision by resolution. (*Id.*, § 12.28A.9(c).)

[8]Named as defendants in the petition were: Robert Janovici, the chief zoning administrator; Elias Martinez, the city clerk; the city planning commission; and the City itself.

[9]As to discovery, the Mohilefs wanted the City to arrange for their experts to test for odors on the properties of nearby landowners.

"We have a court reporter to my left. Please for the benefit of the court reporter speak loudly enough so that she can hear you, and slowly and distinctly so she can report properly what's being said today. I'll ask each person that speaks today to come to the podium here, state your name, either your home address, your business affiliation, attorney affiliation, at least so we'll know who you are.

"There will be no swearing in, there will be no oaths. . . . To the extent we can keep this more informal than formal, I would appreciate it. I would appreciate if people did not repeat themselves. So if somebody says what you were going to say, you don't need to say it again. When it's your turn to speak, you can indicate that it's basically been said.

". . . You all got copies of the hearing notice, I presume, or have heard from neighbors who have received copies. I've reviewed the file, what's in here to date. And I know various parties have also reviewed the file. There are letters from attorneys on both sides of this issue. There are many letters from residents of Monteria Estates or adjoining Monteria Estates.

"I have photographs of the site. I have been to the site this morning. . . . There has also been a formal request that there be cross-examination of certain statements that people make to determine the validity or the veracity of those statements. And generally speaking, that's not done in these quasi-judicial hearings. . . .

"However, because of the level of emotion and economics that are at stake, I will try to provide an avenue for questions to be asked. They will not be asked as you see in a trial court where questions are posed to witnesses who sit in a box near the judge and so forth. But those questions can be asked by those persons who wish to ask them, direct to me. And if those persons who would have the answers or the responsibility for answering choose to answer, then I would suggest that if you're able to take notes, those of you who want to respond, you may do so, but I can't order you to respond to any questions.

"My concern in this regard is that we don't go on and have question and response and then counter question and counter response, and we'll be debating back and forth all day long. I'm not going to put a time limit on any speaker at this point. . . ."

After the AZA's introductory remarks, approximately 19 witnesses (18 residents and an attorney representing one of them) spoke against the presence of ostriches and emus on the Mohilef ranch. One neighbor described the "stench" from the birds as "overpowering" and stated that the

odor had prevented her family from sitting outdoors or enjoying their swimming pool. Another resident likened the odor to an overflowing cesspool. One witness complained about the "feces-filled dust [that] coat[s] the water in our pool and clog[s] our lungs." Another stated that ostrich feathers "are in my yard, in my screens, all over the house. Should I open the door and walk out, they come in with me. . . . It's a daily blanketing of that." There was also testimony that the presence of the birds had made it difficult or impossible to sell nearby properties. More than one witness blamed the birds for causing a variety of illnesses, such as sinus infections and respiratory conditions. The gist of the testimony was that the odor of the birds was intolerable and that their presence had substantially curtailed the outdoor activities of many residents and had adversely affected the physical or psychological health of several neighbors.[10]

Following the testimony of these witnesses, the Mohilefs' attorney addressed the AZA. He challenged the credibility of several witnesses, claiming that they had their own "nefarious agendas," which he described witness by witness. Next, Mohilef himself spoke, discussing the operation of the ranch and his efforts to contain odors and keep the property sanitary. Finally, the Mohilefs presented the testimony of Jay Stern, an employee of Applied Biogenics, Inc., an environmental forensic chemistry company they had retained. Stern substantiated the neighbors' complaints about the existence of an unpleasant odor, but stated that the smell came from several sources, including livestock located on the property of others and methane emissions from a nearby lake. Stern also submitted a written report outlining his testing methods and conclusions.

Toward the end of the hearing, Richard Felosky, an employee in the City's department of animal regulation, testified about the prior permits issued to Mohilef for various animal uses on the ranch and about zoning laws in general as they applied to animals. Felosky also stated that Mohilef was operating a commercial ostrich farm at the ranch for which he had a permit application pending. Felosky indicated that the Mohilefs' ostrich farm was the largest one of which he was aware.

The final witness, Thomas Stevens, was a principal building inspector with the City's department of building and safety. He testified that it was

---

[10]During the testimony of the residents, the AZA occasionally asked questions to clarify the witnesses' statements. For example, when witnesses complained that they had found ostrich and emu feathers on their property, the AZA made an effort to determine if, in fact, the feathers had come from those birds.

unclear whether City law permitted an ostrich farm in an "A-1" zone.[11] Stevens also mentioned that he had inspected the Mohilef ranch on three occasions in 1994 (March 1, April 13, and May 19).

The AZA allowed the Mohilefs' attorney to question both Felosky and Stevens. In response to that questioning, Felosky stated that, with the exception of the pending permit applications, all of Mohilef's prior applications—"for hundreds of animals"—had been approved. As for Stevens, he was asked about the condition of the ranch based on his on-site inspections. He replied: "To be honest with you, I was impressed by the cleanliness of the area. I've seen a lot of boarding stables that are a lot worse. I was surprised by the large number of animals on the property."

On July 29, 1994, the AZA issued his determination, finding that "the past operation of **the keeping of ratites (emus and ostriches)** has adversely affected the health, peace or safety of persons in the surrounding area, has jeopardized or endangered the public health or safety of such persons, constitutes a public nuisance, and has resulted in repeated nuisance activities." (Boldface in original.) This determination, according to the AZA, was "[b]ased upon the oral and written testimony as a result of the public hearing on this matter, including letters, photographs and correspondence in the case file, and the Staff Report." Included among the AZA's specific findings of fact were the following: "Due to the winds which affect this area throughout the year, the odor of feces and urine from the ratites carries beyond the abutting properties. These winds also . . . are prone to distributing fecal matter and feathers into the air where they are deposited on other properties. . . . [¶] . . . When persons must close the windows of their dwellings and curtail both passive as well as recreational events on their property, their physical and mental health is obviously affected. The psychological [effect] of being a prisoner in one's own home should not be underestimated . . . ."

In reaching his decision, the AZA rejected the Mohilefs' attack on the credibility of certain witnesses at the public hearing, stating: "The lengthy testimony at the public hearing and letters in the case file between neighbors and [Mohilef] in the months preceding the hearing constitute either a reasonable basis on which to conclude that the nuisance impacts are not imagined or reflect mass collusion by the neighbors based upon some

---

[11]Stevens noted that aviaries are allowed in an "A-1" zone (see fn. 2, *ante*) and that ostriches are birds. On the other hand, as Stevens further explained, the "official use list" developed by the zoning administrator expressly refers to an "ostrich farm" as permitted in zones "M-2" and "M-3," which are industrial zones. The official use list does not mention ostrich farms as a permitted use in an "A-1" zone. Nevertheless, when Stevens sought assistance from the zoning administrator and the zoning administrator's office about whether ostriches could be kept in an "A-1" zone, they would not give him any advice.

unspoken grudge or personal agenda. [The Mohilefs'] attorney made the latter representations at the hearing relative to some neighbors but did not suggest any motivation as to why the neighborhood at large would jettison its good conscience and gang up against his client. In this regard, I can only conclude that the specificity of the cited incidents by a variety of persons who appear of sound mind and demeanor is more believable than the operator of the subject bird farm . . . ."

To abate the nuisance, the AZA imposed several conditions on the Mohilefs, including reducing the number of ratites to 195 and implementing a plan for the prompt removal, containment, and disposal of ratite feces.[12] The Mohilefs were also required to pay $4,052 to reimburse the City for the cost of the administrative proceeding.

The Mohilefs appealed the AZA's decision to the City's board of zoning appeals (the Board). In their appeal, the Mohilefs asserted that the AZA had violated their due process rights by refusing to let them cross-examine and subpoena witnesses and by failing to require testimony under oath. The Mohilefs also asserted that the AZA's findings and conclusions were not supported by competent evidence.

On October 4, 1994, in accordance with City law (L.A. Mun. Code, §§ 12.21A.15(b), 12.28A.5), the Board held a public hearing on the Mohilefs' appeal. At the beginning of the hearing, Associate Zoning Administrator Green briefly explained the basis of his decision. He acknowledged that "[Mohilef] has pointed out numerous alleged deficiencies, including, for example, not swearing in witnesses, which is not a practice of this department, nor of the City Council; and the right to cross-examine. And I provide the same comment, that the City Council does not do that. So we're not compelled . . . to do the same."

After the AZA's comments, the Mohilefs' attorney requested that witnesses be placed under oath before testifying at the hearing. The Board's chairman denied that request, stating: "Your point is that you would like to have sworn testimony. You would like to have the procedures that are followed in superior court, okay; correct? [¶] . . . [¶] This court is not designed for that. This is basically a lay board. This isn't filled with lawyers. We don't have evidentiary procedures. We have the rules set up by the— very general rules set up by the city ordinances, and we work within that

---

[12]In calculating the number of ratites that could be kept at the ranch, the AZA noted that, under City zoning laws, the Mohilefs could lawfully maintain 65 horses on the property. Based on a weight comparison of horses to ostriches, the AZA arrived at a ratio of one horse per three ostriches. Using a multiplier of three, the AZA decided that the Mohilefs could keep one hundred ninety-five ratites.

framework." With this procedural issue resolved, the Mohilefs' attorney addressed the merits of the appeal, urging the Board to overturn the AZA's decision.

After the Mohilefs' attorney concluded his remarks, approximately 17 witnesses testified against the appeal. In large part, the testimony reflected the same concerns and problems presented by neighbors at the hearing before the AZA.

On October 20, 1994, the Board issued its decision, affirming the findings of the AZA, but modifying the conditions he imposed by ordering that the number of ratites be reduced to zero.[13] The Mohilefs appealed the Board's decision to the city council. However, the council did not act on the appeal within the time period fixed by law, which rendered the Board's decision "final and conclusive." (L.A. Mun. Code, § 12.28A.9(c); see id., § 12.21A.15(b).)[14]

In April 1995, the Mohilefs amended their previously filed petition for writ of mandate to allege that (1) the City had violated their right to procedural due process in the hearings before the AZA and the Board by denying them the right to subpoena and cross-examine witnesses, to engage in discovery, and to obtain testimony under oath, and (2) the AZA and the Board had abused their discretion in ordering the removal of ratites from the ranch.[15] After considering the parties' memoranda of points and authorities and oral arguments, the trial court denied the petition by minute order. In August 1995, judgment was entered in favor of the City and the other defendants. (See fn. 8, ante.) The Mohilefs filed a timely notice of appeal.

[13]By directing that all ostriches and emus be removed, the Board necessarily rendered moot the AZA's condition relating to the cleanup of bird feces.

[14]The Mohilefs had to file an appeal from the Board's decision within 15 days after the decision was mailed to them, i.e., on or before November 4, 1994. (See L.A. Mun. Code, § 12.28A.9(b).) A timely appeal was filed. The council then had 90 days to act on the appeal, absent an agreement by the Mohilefs to extend the deadline. (See id., § 12.28A.9(c).) The 90-day period expired on February 2, 1995, without any action by the council and without the Mohilefs' consent to extend the time period.

[15]With respect to their due process claim, the Mohilefs sought a writ of mandate pursuant to Code of Civil Procedure section 1085, which authorizes the superior court to issue a writ to "any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins." (Code Civ. Proc., § 1085.) With respect to their challenge to the merits of the administrative decisions, the Mohilefs sought a writ pursuant to Code of Civil Procedure section 1094.5, which applies "[w]here the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (Id., § 1094.5, subd. (a).)

## DISCUSSION

The Mohilefs argue on appeal, as they did throughout the administrative proceeding, that due process entitled them to several procedural protections which they did not receive. We conclude that due process was satisfied because the City provided the Mohilefs with notice of the basis for the nuisance abatement proceeding and with a meaningful opportunity to be heard on the matter.

The Mohilefs also raise several challenges to the merits of the decisions by the AZA and the Board. We find no error in the AZA's decision but conclude that the Board erred in reducing the number of ratites to zero.

### A. Due Process Protections

■ Whether we treat the petition below as one for traditional mandate (Code Civ. Proc., §§ 1084-1094) or administrative mandate (*id.*, § 1094.5), the standard of review is the same. Because the Mohilefs' contention regarding procedural matters presents a pure question of law involving the application of the due process clause, we review the trial court's decision de novo. (See *Riveros* v. *City of Los Angeles* (1996) 41 Cal.App.4th 1342, 1348-1350 [49 Cal.Rptr.2d 238]; *Jefferson* v. *Compton Unified School Dist.* (1993) 14 Cal.App.4th 32, 37-38 [17 Cal.Rptr.2d 474].)

■ As a prerequisite to invoking the protections of the due process clause, the Mohilefs must establish a constitutionally protected property interest in keeping ostriches and emus on their ranch. (See *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 571 [33 L.Ed.2d 548, 557, 92 S.Ct. 2701]; *Traverso* v. *People* ex rel. *Dept. of Transportation* (1993) 6 Cal.4th 1152, 1160 [26 Cal.Rptr.2d 217, 864 P.2d 488].)[16] Given that the Board precluded the Mohilefs from keeping a single ratite on the ranch, the property interest at stake is not the maintenance of an "ostrich farm," nor is it an interest in having several hundred ratites on the ranch. Rather, it is an interest in keeping at least some ratites on the property. In light of the Mohilefs' ownership interest in the ranch and the fact that Mohilef partially owns the ratites through his commercial ventures, the City's nuisance abatement proceeding sufficiently implicates a protected property interest. (See *Traverso* v. *People* ex rel. *Dept. of Transportation*, *supra*, 6 Cal.4th at pp. 1160-1161 [discussing types of property interests protected by due process].)

---

[16]The Mohilefs base their claim on both the state and federal due process clauses (Cal. Const., art. I, § 7, subd. (a); U.S. Const., Amend. XIV), which have the same scope in this case (*Sandrini Brothers* v. *Voss* (1992) 7 Cal.App.4th 1398, 1405, fn. 2 [9 Cal.Rptr.2d 763]; *Schultz* v. *Regents of University of California* (1984) 160 Cal.App.3d 768, 780-787 [206 Cal.Rptr. 910]). Accordingly, we rely on decisions construing either provision. For convenience, we will simply refer to the "due process clause" in the singular.

Moreover, as set forth in the Los Angeles Municipal Code, the uses permitted in an "A-1" agricultural zone appear to include the keeping of some ratites on the property. The code permits the use of aviaries (L.A. Mun. Code, § 12.05A.6) and also authorizes "[t]he keeping of equines, bovines, goats or other domestic livestock . . . [and] [*a*]*ny other similar uses or enterprises* customarily carried on in the field of agriculture and not obnoxious or detrimental to the public welfare" (*id.*, §§ 12.05A.7, 12.05A.9, italics added).[17] Thus, the Mohilefs had a protectible property interest in keeping some ratites on the ranch and were entitled to due process safeguards in the administrative process.

Having decided that the due process clause applied to the City's nuisance abatement proceeding, we must now determine what process was due. ■ "Due process principles require reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest." (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 612 [156 Cal.Rptr. 718, 596 P.2d 1134]; see also *Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 428-430 & fn. 5 [71 L.Ed.2d 265, 272-273, 102 S.Ct. 1148] [due process requires adequate notice and meaningful opportunity to be heard].) "However, there is no precise manner of hearing which must be afforded; rather the particular interests at issue must be considered in determining what kind of hearing is appropriate. A formal hearing, with full rights of confrontation and cross-examination is not necessarily required." (*Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 565 [216 Cal.Rptr. 367, 702 P.2d 525].) " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." (*Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502], quoted with approval in *In re Love* (1974) 11 Cal.3d 179, 190, fn. 11 [113 Cal.Rptr. 89, 520 P.2d 713].)

■ As our Supreme Court stated in *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622] (hereafter *Ramirez*): "[T]he extent to which due process [protections] will be available depends on a careful and clearly articulated balancing of the interests at stake in each context. In some instances this balancing may counsel formal hearing procedures that include the rights of confrontation and cross-examination, as well as a limited right to an attorney. . . . In others, *due process may require only that the administrative agency comply with the statutory limitations on its authority.* . . .

---

[17]Mohilef has always maintained an aviary on the property. An "aviary" is "a house, *enclosure*, or large cage for confining live birds" (Webster's Third New Internat. Dict., *supra*, p. 151, col. 2, italics added), and ostriches are undoubtedly birds (*id.* at p. 1598, col. 2). Since 1981, ratites have been present on the ranch on an intermittent basis. It was not until sometime in 1993—when the number of ostriches and emus increased substantially—that neighbors began experiencing problems with the birds.

More specifically, identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.* at p. 269, citations omitted, italics added; followed in *In re Malinda S.* (1990) 51 Cal.3d 368, 383 [272 Cal.Rptr. 787, 795 P.2d 1244].) A similar balancing test was adopted by the United States Supreme Court in *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33, 96 S.Ct. 893](hereafter *Mathews*).[18]

■ As to the first *Ramirez* factor, we believe that the Mohilefs' interest in keeping some ratites on their property is an important one. Regardless of whether the birds are being used as part of a scientific study, commercial enterprise, personal hobby, or some combination thereof, the Mohilefs have a valid interest in using their property free from unreasonable or arbitrary governmental interference. (See *Hansen Brothers Enterprises, Inc.* v. *Board of Supervisors* (1996) 12 Cal.4th 533, 551-552 [48 Cal.Rptr.2d 778, 907 P.2d 1324]; *McKay Jewelers, Inc.* v. *Bowron* (1942) 19 Cal.2d 595, 600-601 [122 P.2d 543, 139 A.L.R. 1188].)[19]

At the same time, however, Mohilef does not contend that the abatement of the alleged nuisance (i.e., the removal of the ratites) will adversely affect his business opportunities or his livelihood. Nor does he claim that he or his commercial ventures will incur any economic losses if the birds are moved

---

[18]The *Mathews* test examines three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (424 U.S. at p. 335 [47 L.Ed.2d at p. 33].)

The factors under *Mathews* and *Ramirez* are virtually identical, except that *Ramirez*'s third factor requires the government to treat an individual with dignity and respect. (See *Anderson* v. *Superior Court* (1989) 213 Cal.App.3d 1321, 1329-1330 [262 Cal.Rptr. 405] [discussing both tests].) In the present case, the result is the same under either test.

[19]Of course, a property owner must use his property in accordance with applicable laws. However, in deciding what procedural protections apply in a nuisance abatement proceeding, we first examine the nature of the property owner's interest. In defining that interest, we do not consider the substantive question of whether the property owner's activities actually constitute a nuisance. Put another way, we evaluate the property owner's interest from *his* viewpoint (e.g., to keep ratites on his property), not from the perspective of his neighbors (e.g., to create a nuisance).

elsewhere. Indeed, Mohilef eventually sends all of the birds to one of his commercial facilities (when they reach the age of eight to ten months). Further, the City's action will not require that the ranch—the land or the improvements—be altered or modified. At most, the Board's decision will simply bring an early end to Mohilef's "density study" and require that he pay the costs incurred in connection with the administrative proceeding. Consequently, the Mohilefs' interest is not as significant as it otherwise might be if, for example, the abatement proceeding threatened to permanently shut down an existing business concern.

In light of the Mohilefs' legitimate interest in keeping ratites at their ranch, we now apply the remaining *Ramirez* factors in deciding whether the City deprived them of any procedural protections demanded by the due process clause. In doing so, we heed these cautionary words from a leading authority on administrative law: "The complicated nature of the cost-benefit analysis required by the *Mathews* test raises serious questions concerning the competence of judges to apply that test. Legislatures and agencies have significant comparative advantages over courts in identifying and measuring the many costs and benefits of alternative decisionmaking procedures. Thus, while it is imperative that courts retain the power to compel agencies to use decisionmaking procedures that provide a constitutionally adequate level of protection . . . , judges should be cautious in exercising that power. In the vast bulk of circumstances, the procedures chosen by the legislature or by the agency are likely to be based on application of a *Mathews*-type cost-benefit test by an institution positioned better than a court to identify and quantify social costs and benefits. A court should give serious consideration to second-guessing a legislative or agency choice of procedures only when it has indications that the agency or legislature chose its procedures in bad faith or without considering the implications of its choice of procedures. . . . Lawyers and judges have a systematic tendency to overestimate the benefits of trial-type procedures and to underestimate the costs of those procedures." (2 Davis & Pierce, Administrative Law Treatise (3d ed. 1994) § 9.5, p. 61.)

As the United States Supreme Court has explained: "The ultimate [question] involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness. We reiterate the wise admonishment of Mr. Justice Frankfurter that differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.' . . . The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The

essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' . . . All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard' . . . to insure that they are given a meaningful opportunity to present their case. ▮ *In assessing what process is due . . . , substantial weight must be given to the good-faith judgments of the [agency] that [its] procedures . . . assure fair consideration of the . . . claims of individuals.*" (*Mathews, supra*, 424 U.S. at pp. 348-349 [47 L.Ed.2d at p. 41], citations omitted, italics added.)

### 1. *Testimony Under Oath*

▮ Neither the AZA nor the Board administered an oath to witnesses who testified at the public hearings. The Mohilefs contend that the due process clause required sworn testimony. We disagree.

The requirement of a testimonial oath was firmly embedded in the common law and has long been a part of our *judicial* system. (Wright & Gold, Federal Practice and Procedure (1990) § 6041, pp. 254-261 [discussing history of oath]; Note, A *Reconsideration of the Sworn Testimony Requirement: Securing Truth in the Twentieth Century* (1977) 75 Mich. L.Rev. 1681, 1684-1698 [same].) In contrast, the use of an oath is not of similar historical importance in administrative proceedings. (See, e.g., *Brousseau* v. *United States* (1981) 640 F.2d 1235, 1241-1242 [226 Ct. Cl. 199]; *Baker* v. *City of Detroit* (E.D.Mich. 1979) 483 F.Supp. 919, 928, affd. (6th Cir. 1983) 704 F.2d 878 mod. on rehg. 712 F.2d 222.)

Accordingly, in *Broussard* v. *Regents of University of California* (1982) 131 Cal.App.3d 636 [184 Cal.Rptr. 460], the First District Court of Appeal concluded that the due process clause did not mandate sworn testimony in an administrative hearing. In that case, the petitioner, an employee of the University of California, San Francisco, was terminated for absenteeism. She challenged the termination before a university hearing committee, which allowed witnesses to testify without being sworn. The administrative process resulted in a decision in favor of the university. The petitioner sought a writ of mandate from the superior court, arguing that the lack of sworn testimony violated her right to due process. The trial court denied the petition. The Court of Appeal affirmed, stating: "Applying the balancing test in *Mathews*, we find that appellant has an important interest in her continued employment and that it would be a small burden to require oaths to be administered. Militating against this additional requirement is the University's policy to minimize formalities. . . . In light of these conflicting policies, the overriding concern is whether appellant risked erroneous deprivation of her job

through the procedures employed. . . . We conclude that she suffered no such risk. [¶] At the evidentiary hearing appellant, through her counsel, was able to introduce exhibits, examine documents introduced by the University, cross-examine adverse witnesses, introduce favorable testimony—which she declined to do—and argue her case to the Committee. [¶] The evidence was never in dispute. . . . The sole question presented to the Committee was whether the University was justified in terminating appellant . . . . The University's witnesses could not be described as self-interested with a motive to testify untruthfully." (*Id.* at p. 641, citations omitted.)

Similarly, in *Flagstad* v. *City of San Mateo* (1957) 156 Cal.App.2d 138 [318 P.2d 825], a city council granted a zoning variance to a property owner after a public hearing at which witnesses provided unsworn testimony. An adjoining property owner sought a writ of mandate in superior court to invalidate the variance. The trial court issued the writ, in part because the council had not required testimony under oath. The Court of Appeal reversed, noting: "[I]t is clear that witnesses in a council proceeding of this sort need not be sworn . . . ." (*Id.* at p. 141, citation omitted.)

In *Jackson* v. *City of San Mateo* (1957) 148 Cal.App.2d 667 [307 P.2d 451], the city approved an application for a use variance after holding a public hearing on the matter. The plaintiffs filed suit, seeking to set aside the city's decision on the ground that ". . . the witnesses appearing before the planning commission and the city council were not sworn." (*Id.* at p. 669.) To this challenge, the Court of Appeal responded, "There is no such requirement." (*Ibid.*)

Federal courts have reached the same conclusion. In *Potemra* v. *Ping* (S.D.Ohio 1978) 462 F.Supp. 328, the court held that unsworn testimony was constitutionally permissible at an administrative hearing. There, the plaintiff, a tenured professor at Ohio University, was terminated for willfully neglecting his administrative and teaching duties. He challenged the termination before a faculty hearing committee, which conducted an informal hearing without placing witnesses under oath. The committee upheld the termination, and its decision was sustained by the board of trustees. The plaintiff filed suit in federal court, contending that the due process clause required the use of sworn testimony at the committee hearing. The court rejected this contention, explaining:

"The private interest involved here, the retention of a tenured teaching position, is very important. . . . The administrative burden upon the State of Ohio here is not significant. Given that a hearing is required as a due process minimum, the additional step of swearing witnesses should not be a

practical burden. . . . The state's interest, then, in avoiding the use of an oath in this case is the desire to prevent the hearing from becoming too formal and to retain the 'peer group' ambience.

"The remaining factor to be considered in the *Mathews* analysis is the effectiveness of the additional procedure in reducing the risk of an erroneous deprivation of a protected liberty or property interest. An oath certainly has some usefulness in this regard, or its use in all courts of law would be puzzling. The oath would appear to be especially useful as a vehicle for ascertaining the truth where issues of fact are fully and hotly contested. The trier of fact, in accepting one version of the facts, is virtually determining that the other side has not been truthful. Where witnesses are self-interested and the incentive to evade or shade the truth is high, the opposite incentive created by an oath may provide an appreciable safeguard for someone about to be deprived of a liberty or property interest. Especially where other procedural protections are lacking, the use of an oath could be important to the ultimate determination that minimal due process was afforded. . . .

"In the instant case, very few of the facts were wholly contested by the plaintiff. . . . The committee's central concern was with the plaintiff's justification for his actions, and, accordingly, whether that conduct was professionally acceptable. Few of the witnesses can even arguably be described as self-interested in the manner of a party witness in a civil trial, or a witness at an agency hearing who either seeks or is subject to that agency's regulation. . . . In sum, the Court is not convinced that the witnesses at this hearing were substantially more likely to testify untruthfully because no oath was administered. The lack of an oath in this case did not make this otherwise extensive evidentiary hearing fundamentally unfair or Constitutionally infirm." (462 F.Supp. at pp. 334-335.) In other words, "the trial court [in *Potemra*] concluded that, notwithstanding plaintiff's property interest in his faculty position and the minor administrative burden to administer an oath, the extensive evidentiary hearing provided the necessary due process safeguards." (*Broussard* v. *Regents of University of California, supra,* 131 Cal.App.3d at p. 642, construing *Potemra.*)

As the federal district court recognized in *Baker* v. *City of Detroit, supra,* 483 F.Supp. 919, there is "no *requirement* that testimony be under oath . . . . Procedural informality is the hallmark of administrative proceedings as opposed to judicial proceedings." (*Id.* at p. 928.) Other federal decisions are in accord. (See, e.g., *Brousseau* v. *United States, supra,* 640 F.2d at pp. 1241-1242 [written statements did not have to be sworn because "[i]t is settled that strict rules of evidence do not apply to administrative proceedings"]; *Wool* v. *Maryland-Nat. Capital Park & Plan. Com'n* (D.Md. 1987)

664 F.Supp. 225, 231 [absence of oath did not violate due process since board members were still able to judge credibility of witnesses]; *Sinclair Oil Corporation* v. *Smith* (S.D.N.Y. 1968) 293 F.Supp. 1111, 1115 ["Failure to administer oaths to witnesses and denial of an offer of proof are not necessarily denials of due process in the context of an administrative hearing."].)

State courts outside California have also held that witnesses in an administrative proceeding need not be placed under oath. In *Monte Vista Prof. Bldg., Inc.* v. *City of Monte Vista* (1975) 35 Colo.App. 235 [531 P.2d 400], a group of physicians sought a zoning variance to open a pharmacy in their building. The city's board of adjustment held a public hearing on the variance request, heard the unsworn testimony of witnesses, and denied the variance. The physicians filed suit, arguing that the board had acted unlawfully by accepting unsworn testimony. The trial court agreed and ordered the board to grant a variance. The Colorado Court of Appeals, reversed, stating:

"A hearing before a Board of Adjustment should be conducted in an orderly manner but need not strictly conform to the rules of procedure and evidence necessary in a judicial proceeding. . . . [I]t is generally recognized that proceedings in zoning matters are informal, the strict rules of evidence need not apply, and the basic requirement is that the princip[le]s of fundamental fairness be observed. [Citation.] Other jurisdictions have held that in the absence of a statutory requirement that witnesses be sworn, it is not error for an administrative body to hear testimony from unsworn witnesses. [Citations.]

"The record indicates that all parties were given an opportunity to be heard. The Board is not required to disregard the opinions and feelings expressed by neighbors and residents because they were not put under oath. In so holding we note that the city zoning ordinance does not require that witnesses be placed under oath at a public hearing. It would have been proper for the Board to have permitted only sworn testimony, but it did not err in failing to do so." (35 Colo.App. at p. 238 [531 P.2d at pp. 401-402].)

In *Matter of Stowman* (1985) 200 N.J.Super. 507 [491 A.2d 1275], an employee of the New Jersey Department of Corrections received a five-day suspension for unsatisfactory job performance. At an administrative hearing to review the suspension, the employee's request for sworn testimony was denied, and the hearing officer ultimately upheld the suspension. The employee then sought judicial relief, arguing that the hearing officer's failure to require sworn testimony violated due process. The court rejected that contention on the grounds that "unless required by statute, rule or regulation,

sworn testimony of witnesses in administrative proceedings need not be taken. . . . [¶] . . . [¶] . . . [E]ven if appellant was entitled to due process protection, he has not shown that he was entitled to have witnesses sworn before testifying at the hearing on the charges against him. . . . [¶] While witnesses may be called, this does not necessarily mean that they must be sworn . . . . '[F]airness and not rigid formality should be the touchstone.' . . . Procedural requisites vary depending on the importance of the interests involved, with the goal being to minimize the possibility of injustice." (200 N.J.Super. at pp. 511-512 [491 A.2d at p. 1278].)

In *Bellemeade Company* v. *Priddle* (Ky.Ct.App. 1973) 503 S.W.2d 734, a case involving an application for a neighborhood development plan, the Kentucky Court of Appeals rejected the argument that the planning commission had to evaluate the application based on sworn testimony. The court stated: "The Planning Commission conducted several public hearings. The opposing parties were represented by counsel who made comprehensive statements and furnished exhibits to the Commission. The Commission members asked questions, cross-examined speakers and received answers. Although the witnesses who spoke were not sworn, many stated reasons why they felt it improper to grant the proposal. All were given a full opportunity to express themselves and to refute and contradict those who expressed contrary views." (*Id.* at p. 740.)

More recently, the Kentucky Supreme Court, relying in part on *Bellemeade*, held that "[a]lthough it may be better practice to swear witnesses appearing before the Zoning Commission, such procedure is not mandated nor is failure to swear a witness constitutionally inadequate. The concept of constitutional due process in administrative hearings is flexible. . . . [D]ue process . . . does not require, in the context of a Planning Commission hearing, the swearing of witnesses." (*Danville-Boyle County* v. *Prall* (Ky. 1992) 840 S.W.2d 205, 207, citations omitted.)

Other state courts have reached similar conclusions. (See, e.g., *East Camelback Homeowners Ass'n* v. *Arizona F. N. & P.* (1972) 18 Ariz.App. 121, 128 [500 P.2d 906, 913] [failure to administer oath to witnesses will not vitiate administrative proceeding unless a statute expressly requires use of oath] mod. on rehg. 19 Ariz.App. 118 [505 P.2d 286]; *Glasser* v. *Town of Northport* (Me. 1991) 589 A.2d 1280, 1284 [neither case law nor statutes support contention that sworn testimony is required at hearing before planning board]; *Aprile* v. *LoGrande* (1982) 89 A.D.2d 563, 565 [452 N.Y.S.2d 104, 107] ["A public hearing is not a formal quasi-judicial hearing which requires the swearing of witnesses . . . ."] affd. (1983) 59 N.Y.2d 886, 466 N.Y.S.2d 316 [453 N.E.2d 545]; *Duffard* v. *City of Corpus Christi*

(Tex.Ct.App. 1960) 332 S.W.2d 447, 450 [rejecting challenge to use of unsworn testimony at public hearing before city council on land-use matter because "rules as to the examination of witnesses are relaxed in administrative proceedings"].)

Consistent with these authorities, we hold that the AZA and the Board did not violate the due process clause by failing to require sworn testimony at the public hearings. No statute, rule, or regulation required that witnesses be sworn. Further, although the Mohilefs' property interest is important, it is not of such magnitude as to mandate a fundamental change in the manner of conducting the hearings, especially in light of the minimal effect that an adverse decision would have on the Mohilefs. Moreover, we do not believe that the City's current hearing process creates an unacceptable risk of an erroneous decision or that the additional requirement of sworn testimony would materially improve the administrative system. If anything, such a requirement—with its emphasis on formal procedures—would place an undue burden on the City.

The AZA and the chairman of the zoning appeals board made clear at the public hearings that the City has adopted procedures in nuisance abatement proceedings which are designed to keep the hearings informal. Indeed, it is well established that ". . . a presentation to an administrative agency may properly include evidence that would not be admissible in a court of law." (*Carmel Valley View, Ltd.* v. *Board of Supervisors* (1976) 58 Cal.App.3d 817, 823 [130 Cal.Rptr. 249].) The informality of the public hearings, including the lack of an oath, is an important aspect of the decisionmaking process.

The AZA's written determination was based on a variety of sources, including letters in the case file. Although the letters of complaint may not have been admissible in a court of law, they serve an important function in the administrative setting. Many residents may be unable to attend the public hearing, but they should still be permitted to register their opinions and feelings on the matter. It follows that the AZA should be able to consider such evidence in reaching a decision. (See *Goat Hill Tavern* v. *City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1524, 1531 [8 Cal.Rptr.2d 385] [substantial evidence supported writ of mandate directing city to renew conditional use permit where administrative record contained letters from members of community in favor of permit]; *Eger* v. *Levine* (1989) 153 A.D.2d 998 [545 N.Y.S.2d 618] [unsworn letters from residents constituted sufficient evidence for zoning appeals board to grant request for a use variance]; *Clinkscales* v. *City of Lake Oswego* (1980) 47 Or.App. 1117, 1122-1123 [615 P.2d 1164, 1168] [in conducting public hearing on request

for zoning change, city council did not violate due process by admitting in evidence letter from neighborhood association opposed to rezoning].)

Yet, the Mohilefs' argument, if accepted, would formalize nuisance abatement proceedings to the point where letters from members of the community would be beyond consideration. To interpret the Constitution as mandating the exclusion of unsworn testimony would necessarily render personal correspondence inadmissible as well. Further, since the argument for requiring an oath is based on the premise that unsworn testimony is not trustworthy, we fail to see how the due process clause could mandate the use of an oath without also requiring the adoption of other, more formal rules of evidence, such as the hearsay rule. (See 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 558, pp. 533-534 [purpose of hearsay rule is to exclude untrustworthy statements not made under oath].)

We decline to interpret the due process clause in a manner that would force municipalities to observe formal rules of evidence in nuisance abatement proceedings. To do so would transform an efficient factfinding process into a technical, cumbersome procedure, would encourage witnesses to assume the financial burden of retaining counsel in preparing their testimony (or discourage them from appearing if they cannot or do not retain counsel), and would alter the nature and functioning of the AZA and the Board by injecting legalisms and attorneys into what is currently a process governed by laypersons.

As a leading authority on land-use regulation has noted: "The board of adjustment [or zoning appeals board] is an administrative body composed primarily, if not entirely, of persons without legal knowledge or experience. . . . [¶] . . . [¶] Board hearings are informal to the point of being casual. Few witnesses are subpoenaed; witnesses frequently are not placed under oath; cross-examination is uncommon. . . . [¶] . . . [¶] . . . Overall, the usual board proceeding is permissive, informal, and nontechnical. It is assumed that the board, equipped by its familiarity with the community and its broad understanding of the community plan, can separate the material and relevant facts and arrive at the truth." (4 Anderson, American Law of Zoning (3d ed. 1986) §§ 22.01, 22.30, pp. 3-5, 78, fns. omitted.) "In determining whether a particular hearing meets the requirement that a board act only after notice and hearing, the courts have recognized that boards of adjustment are not composed of legal experts, and often are not guided by such experts. Accordingly, board hearings have been measured by less exacting standards than are applied to judicial tribunals. The courts have indorsed, or at least they have not disapproved, a degree of informality which is uncommon even to hearings conducted by administrative agencies. . . . [¶] In general, judicial attention is focused upon the question whether the hearing was basically

fair. If the board of adjustment in its conduct of the hearing allowed all persons who desired to speak an opportunity to do so, and afforded to each side a fair chance to articulate his point of view, reversal for failure to hold a fair hearing is unlikely." (*Id.*, § 22.24, pp. 62-63, fns. omitted.)

Another commentator has offered a similar view of land-use hearings: "The courts' approach to the question of the adequacy of hearings by administrative bodies is to say that they must be 'appropriate to the nature of the case.' Thus, a trial-like hearing (with counsel, pleadings, witnesses under oath, cross-examination, and the like) is not always insisted on, and local governing bodies and administrative boards are free to vary their rules in many specifics." (Netherton, *The Due Process Issue in Zoning for Historic Preservation* (1987) 19 Urb. Law. 77, 92, fn. omitted.)

Aside from preserving the informality of the proceedings, other reasons compel the conclusion that due process does not mandate sworn testimony in administrative proceedings to abate a public nuisance. For instance, in deciding whether a particular use of property constitutes a public nuisance, the AZA does not rely solely on the unsworn testimony of witnesses at the public hearing. Before the first witness speaks, the zoning administrator's staff has investigated the matter, visited the property, and prepared a written report to be used in the administrative process. In this case, the AZA himself had visited the Mohilefs' property, as had officials from the departments of animal regulation and building and safety (both of whom testified at the hearing).

Thus, the City not only acts as a neutral arbiter between the owner of the alleged nuisance and the complaining neighbors, it also conducts its own independent investigation into the merits of the dispute. An AZA, who has had the benefit of visiting the site and receiving the opinions of other City investigators, is not in the same position as a judge listening to the first witness in a civil suit. As a consequence of the City's various investigative efforts, the AZA is in a better position to assess the realities of the situation and to evaluate the credibility of unsworn witnesses.

Moreover, we think it pertinent that this case involves a *public* nuisance, i.e., "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.)[20] The notice requirements of the municipal code are designed to provide all interested property owners with information about the public

---

[20]A public nuisance can be abated by a civil, criminal, or administrative action instituted by government officials, but a private citizen has no direct remedy against a public nuisance

hearing.[21] The notice also invites the submission of written comments before the hearing. In this way, the City seeks to ensure that the "entire community, neighborhood, or [a] considerable number of persons" has an opportunity to be heard on the matter. Where, as here, approximately 18 individuals appear at a public hearing and testify to the *same* complaints, the necessity of an oath takes on less significance.[22] As the AZA indicated in his decision, either the entire neighborhood was lying for some unknown reason or, alternatively, the ostriches were in fact causing problems in the community. Even without an oath, the AZA was able to evaluate the credibility of the witnesses and conclude that the neighborhood had not "jettison[ed] its good conscience and gang[ed] up against [the Mohilefs]."

Finally, several existing protections minimize the risk of an erroneous decision despite the absence of an oath. First, the AZA can (and did) question witnesses, as appropriate, to ascertain the truth. Second, witnesses had to state their names and addresses for the record, and they knew that a reporter was transcribing their testimony; this procedure—albeit lacking an oath and the possibility of a perjury prosecution—nonetheless provided an incentive for witnesses to tell the truth. Third, the administrative process involves three levels of decisionmaking (the AZA, the Board, and the city council), each of which requires a review of the record and a public hearing. Fourth, the accused property owner is allowed to present his own witnesses, documents, and legal argument. Lastly, when the administrative process is finished, an aggrieved party can seek judicial review of the City's decision by way of a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5).[23] In sum, "the extensive evidentiary hearing[s] provided the necessary due process safeguards." (*Broussard* v. *Regents of University of*

unless it is "specially injurious" to him. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 124, pp. 805-806; Civ. Code, §§ 3491-3495; Gov. Code, §§ 38771-38773.5.) To be "specially injurious," the damage suffered "must be different in kind and not merely in degree from that suffered by other members of the public." (*Koll-Irvine Center Property Owners Assn.* v. *County of Orange* (1994) 24 Cal.App.4th 1036, 1040 [29 Cal.Rptr.2d 664].)

[21]In addition to notifying the landowner responsible for the alleged nuisance, "[w]ritten notice shall also be mailed to residential, commercial, and industrial occupants of all property within 500 feet of the exterior boundaries of the property involved. . . . If this notice provision will not result in notice being given to at least 20 different owners of at least 20 different parcels of property other than the subject property, and at least 50 different persons, then the 500-foot radius for notification shall be increased in increments of 50 feet until the required number of persons, and parcels of property are encompassed within the expanded area. Notification shall then be given to all property owners and occupants within such area." (L.A. Mun. Code, § 12.21A.15(b).)

[22]This is especially true since the witness statements submitted to the AZA, whether at the hearing or in writing, were based almost exclusively on the personal, firsthand experiences of the witnesses.

[23]Such review examines whether the agency acted in excess of its jurisdiction, whether there was a fair hearing, and whether there was a prejudicial abuse of discretion. (Code Civ.

*California, supra,* 131 Cal.App.3d at p. 642.) Sworn testimony was not required.

Having come this far, our analysis is not yet complete. We must first revisit our decision in *Armistead* v. *City of Los Angeles* (1957) 152 Cal.App.2d 319 [313 P.2d 127]. In that case, the city had declared a building to be a nuisance and ordered its demolition based almost entirely on hearsay evidence submitted at an administrative hearing. The property owner filed a petition for writ of mandate in superior court, which was granted on the ground that the city's determination was not based on substantial evidence. (*Id.* at p. 321.) On appeal, we initially criticized the administrative decision because it rested on "incompetent hearsay evidence." (*Id.* at p. 324.) We then stated: "[I]n such cases as this due process of law requires that any order of demolition of private property under the police power must be based upon competent *sworn* evidence that the subject property falls within the legal concept of a nuisance." (*Ibid.,* italics added.)[24]

In the nearly 40 years since *Armistead* was decided, other Courts of Appeal have acknowledged, in dicta, that it requires "sworn evidence" in public nuisance proceedings. (See *Leppo* v. *City of Petaluma* (1971) 20 Cal.App.3d 711, 717 [97 Cal.Rptr. 840] [citing *Armistead* as interpreting due process clause to require "competent sworn testimony" where city seeks to abate nuisance]; *Suzuki* v. *City of Los Angeles* (1996) 44 Cal.App.4th 263, 280, fn. 7 [51 Cal.Rptr.2d 880] [citing *Leppo* for requirement that "in all cases where a city seeks to abate a nuisance, . . . a determination of nuisance may only be based on competent sworn testimony"].)

However, when directly confronted with the issue, courts have rejected the notion that the due process clause requires sworn testimony in an administrative proceeding. (See *Broussard* v. *Regents of University of California, supra,* 131 Cal.App.3d at p. 641; *People* v. *Gates* (1974) 41 Cal.App.3d 590, 601-602 [116 Cal.Rptr. 172]; see also *Flagstad* v. *City of*

---

Proc., § 1094.5, subd. (b).) An agency commits a prejudicial abuse of discretion if it has not proceeded in the manner required by law, if its decision is not supported by its findings, or if the findings are not supported by the evidence. (*Ibid.*)

[24]As authority for the necessity of sworn evidence, *Armistead* cited four decisions, none of which state any such proposition. In *Jones* v. *City of Los Angeles* (1930) 211 Cal. 304 [295 P. 14], the court held that a zoning ordinance which prohibited mental institutions in certain areas could not be applied retroactively to institutions existing before the ordinance was enacted. In *Eaton* v. *Klimm* (1933) 217 Cal. 362 [18 P.2d 678], the court held that sufficient evidence supported the trial court's determination that an asphalt mixing plant was a public nuisance. (*Id.* at pp. 368-369.) The decision in *McQueen* v. *Phelan* (1907) 4 Cal.App. 695 [88 P. 1099] stands for the principle that a public official may not, "of his own volition . . . tear down or destroy a building [merely] because he believes it to be a nuisance." (*Id.* at p. 697.) And the court in *Trans-Oceanic Oil Corp.* v. *Santa Barbara* (1948) 85 Cal.App.2d 776 [194 P.2d 148] recognized that, in revoking a valid drilling permit, a municipality must afford the permittee notice and a hearing, and base its decision on substantial, competent evidence. (*Id.* at pp. 795, 797.)

*San Mateo, supra,* 156 Cal.App.2d at p. 141.) Indeed, Division Seven of this court recently examined the "procedural due process aspects" of the nuisance abatement procedure now before us (L.A. Mun. Code, § 12.21A.15) and concluded that "[t]his procedure . . . should eliminate any potential for arbitrary findings of nuisance." (*Suzuki* v. *City of Los Angeles, supra,* 44 Cal.App.4th at pp. 267, fn. 2, 280, fn. 7.)

We conclude that the City's nuisance abatement procedure was constitutionally valid in this case despite the lack of sworn testimony. As our prior discussion indicates, the principles of procedural due process have evolved substantially in the decades since *Armistead.* In light of current due process jurisprudence, we disapprove *Armistead* to the extent it requires that witnesses always testify under oath in administrative proceedings to abate a public nuisance.

### 2. *Cross-examination*

The AZA permitted the Mohilefs a limited right of cross-examination, which they exercised in questioning City employees from the departments of animal regulation and building and safety. Nevertheless, the Mohilefs contend that the due process clause accorded them an absolute right to cross-examine all witnesses at the public hearings. We reject this contention.

In *Barton Contracting Co., Inc.* v. *City of Afton* (Minn. 1978) 268 N.W.2d 712, a property owner, Barton Contracting Co., Inc. (Barton), applied for a special use permit to expand its mining operations onto additional property. The city planning commission held a public hearing and recommended that the city council deny the permit. After holding a public hearing of its own, the council followed the planning commission's advice. Barton then sought a writ of mandamus directing the issuance of the permit, complaining that it had not been allowed to cross-examine witnesses at the public hearings. The trial court concluded that Barton's due process rights had been violated. On appeal, the Minnesota Supreme Court reversed, stating:

"The basic rights of procedural due process . . . are reasonable notice of hearing and a reasonable opportunity to be heard. These quasi-judicial proceedings [concerning special use permits] do not invoke the full panoply of procedures required in regular judicial proceedings, civil or criminal, many of which would be plainly inappropriate in these quasi-judicial settings.

"The first respect in which the district court concluded that Barton was denied due process was that Barton was not allowed to cross-examine those

who made adverse statements at the public hearing before the planning commission or the city council. We hold that cross-examination is not an essential of procedural due process in such hearings. . . . The statements made at such a public hearing, unlike a regular judicial proceeding, are not given under oath and are not limited by the traditional rules of evidence. They are usually broad expressions of opinion in favor or against the application. Barton was accorded, and exercised, the opportunity to present information and argument to rebut opposing statements." (268 N.W.2d at p. 716, citations omitted.)

Similarly, in *Donnelly Assoc.* v. *D.C. Historic Preservation* (D.C. 1987) 520 A.2d 270, the District of Columbia Court of Appeals held that cross-examination was not constitutionally required in a public hearing to determine whether property should be designated as a historic landmark. The court explained: "We think it significant in striking the ultimate balance that a designation hearing potentially involves participation by a large number of people. . . . In view of the potential number and variety of interests represented and the nature of the ultimate issues, what we said in *Chevy Chase* [*Cit. Ass'n* v. *District of Columbia Coun.* (D.C. 1974)] 327 A.2d [310,] 317, regarding a decision to close a street, aptly characterizes the public interest in not permitting cross-examination: [¶] 'To impose . . . procedures such as cross-examination on such an inquiry would serve only to frustrate the Council's decision-making. Because the decision to close the street permanently concerns the public generally and because the [Street Readjustment Act] permits any interested person to offer his views at the public hearing, there is the possibility of numerous persons. Given the problem of undue and repetitive cross-examination, the variance of counsel and pro se parties, the enhanced difficulties encountered with the wide range of issues involved in a 'public interest' proceeding, the real possibility of redirect and recross and the interplay of different cross-examinations—the potential for havoc is not insignificant. More importantly, there is the real danger that the Council would be forced to focus on technical matters resulting in the obfuscation rather than clarification of the fundamental policy issues.' [¶] . . . [W]e have said that the right to cross-examination in an administrative proceeding is among those rights considered 'less "fundamental" than other[] [procedural rights]' and therefore that the decision whether to allow it should be 'left to the sound discretion of the officials authorized to issue regulations on the subject.'" (520 A.2d at pp. 284-285; accord, *Zimarino* v. *Zoning Board of Review of Providence* (1963) 95 R.I. 383, 387-388 [187 A.2d 259, 261-262]; *Aprile* v. *LoGrande, supra,* 89 A.D.2d at p. 565 [452 N.Y.S.2d at p. 107].)

As the United States Court of Appeals for the First Circuit has recognized: " '[A] zoning or quasi-zoning question does not constitutionally require

anything like a judicial hearing.' . . . So, omitting cross-examination at a zoning hearing or kindred event does not amount to a denial of due process in violation of the fourteenth amendment." (*Chongris* v. *Board of Appeals of Town of Andover* (1st Cir. 1987) 811 F.2d 36, 41-42].) The Tenth Circuit has agreed, stating: "With respect to [the property owner's] allegations that it was denied the opportunity to cross-examine witnesses against it, [the owner] does not point to a source for the right to cross-examine witnesses in a building permit proceeding. In land use proceedings, parties are simply not entitled to ' "anything like a judicial hearing" ' with all its adversarial trappings." (*Landmark Land Co. of Oklahoma, Inc.* v. *Buchanan* (10th Cir. 1989) 874 F.2d 717, 724.)[25]

While due process may guarantee a right of cross-examination in some types of administrative proceedings (cf. *McLeod* v. *Board of Pension Commissioners* (1970) 14 Cal.App.3d 23, 28 [94 Cal.Rptr. 58] [disability benefits]), no such right existed in the nuisance abatement proceeding here. "Courts should be particularly cautious in deciding whether to require an agency to provide a procedure that has the potential to impose significant costs, such as a right to cross-examine." (2 Davis & Pierce, Administrative Law Treatise, *supra*, § 9.5, at p. 61.)

Balancing the probable value, if any, of a right of cross-examination in administrative nuisance abatement proceedings against the fiscal and administrative burdens that cross examination would entail (see *Ramirez, supra*, 25 Cal.3d at p. 269), we conclude that such a right is not mandated by the due process clause. Just as a requirement of sworn testimony would alter the fundamental nature of the administrative proceeding, so a right of cross-examination would strip the public hearings of their informality. In addition, the cross-examination of most or all witnesses would unnecessarily lengthen the hearings and would certainly encourage witnesses to retain counsel or not testify at all. Moreover, the AZA, as a neutral arbiter, can question

---

[25]The foregoing cases address the right of cross-examination in zoning proceedings, while the case before us involves the abatement of a public nuisance. There are undoubtedly differences between the two types of proceedings. (See *Suzuki* v. *City of Los Angeles, supra*, 44 Cal.App.4th at pp. 271-277 [nuisance abatement is based on past conduct and is intended to protect public health, safety, or morals; zoning ordinances regulate future conduct and are not limited to furthering public health, safety, or morals].) Nevertheless, we consider zoning and nuisance proceedings sufficiently alike to make the zoning cases persuasive on the issue of due process rights in an administrative proceeding. (See *id.* at p. 273 [zoning ordinance can be used to prevent nuisances].) Plainly, nuisance abatement proceedings are "kindred" to zoning hearings and certainly qualify as "land-use" matters. (See *Chongris* v. *Board of Appeals of Town of Andover, supra*, 811 F.2d at p. 42 [cross-examination not required "at a zoning hearing *or kindred event*" (italics added)]; *Landmark Land Co. of Oklahoma, Inc.* v. *Buchanan, supra*, 874 F.2d at p. 724 [judicial-type hearing not required in "land use proceedings"].)

witnesses to clarify their testimony. Finally, while we do not doubt the value of cross-examination as a means of uncovering the truth (see Effective Direct & Cross-Examination (Cont.Ed.Bar 1986)), its value is diminished in cases where numerous witnesses testify to the same basic personal experiences, such as smelling a foul odor or seeing bird feathers collecting on the ground. (See *Stretten* v. *Wadsworth Veterans Hospital* (9th Cir. 1976) 537 F.2d 361, 368-369 [a "collective opinion . . . is not easily shaken by cross-examination"].)

3. *Discovery*

■ The Mohilefs contend that the due process clause mandated a right to prehearing discovery, specifically the right to conduct scientific testing for odors on their neighbors' properties. We disagree.

■ "There is no basic constitutional right to pretrial discovery in administrative proceedings." (*Silverman* v. *Commodity Futures Trading Com'n* (7th Cir. 1977) 549 F.2d 28, 33 [46 A.L.R.Fed 549]; accord, *Weinberg* v. *Commodity Futures Trading Com'n* (C.D.Cal. 1988) 699 F.Supp. 808, 813, affd. (9th Cir. 1989) 884 F.2d 1396; *Delavan* v. *Board of Dental Examiners* (Alaska Ct.App. 1992) 620 So.2d 13, 16.) "The extent of discovery that a party engaged in an administrative hearing is entitled to is primarily determined by the particular agency . . . ." (*McClelland* v. *Andrus* (D.C.Cir. 1979) 606 F.2d 1278, 1285.) Nevertheless, because the due process clause ensures that an administrative proceeding will be conducted fairly, " 'discovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process.' " (*Mister Discount Stockbrokers, Inc.* v. *S.E.C.* (7th Cir. 1985) 768 F.2d 875, 878.)

As our Supreme Court has observed: "The Legislature's silence with respect to prehearing discovery in administrative proceedings does not mean . . . that it has rejected such discovery. Instead, . . . it has left to the courts the question of whether modern concepts of administrative adjudication call for common law rules to permit and regulate . . . prehearing discovery. [¶] Statutory administrative procedures have been augmented with common law rules whenever it appeared necessary to promote fair hearings and effective judicial review. . . . [T]he law determining the adequacy of administrative hearings 'is mostly judge-made law . . .' and 'the standards are essentially the same whether judges are giving content to due process, whether they are giving meaning to inexplicit statutory provisions, or whether they are developing a kind of common law.' " (*Shively* v. *Stewart* (1966) 65 Cal.2d 475, 479 [55 Cal.Rptr. 217, 421 P.2d 65, 21 A.L.R.3d 1431], citations omitted.)

■ In this case, the denial of prehearing discovery did not result in an unfair hearing, nor did it prejudice the Mohilefs' case. It was not necessary

that the Mohilefs collect air samples from *all* nearby properties. It was sufficient that Applied Biogenics, Inc., the firm retained by the Mohilefs, conducted odor testing from approximately fourteen different locations—six on the Mohilef ranch and eight on either public property or the property of neighbors. These various locations were sufficiently dispersed throughout the community to provide data concerning whether the odor of the ostriches and emus was extending beyond the Mohilef property. Moreover, the AZA's determination was not based solely on complaints about odor. He also found that "fecal matter and feathers [are distributed] into the air where they are deposited on other properties." Consequently, the Mohilefs' requested discovery regarding odor detection would not have affected the eventual outcome of the hearing.

### 4. Issuance of Subpoenas

The Mohilefs were not permitted to subpoena witnesses to appear at the public hearing before the AZA or the Board. They argue that the inability to compel the attendance of witnesses on their behalf constituted a violation of due process. Even assuming that the AZA and the Board had the authority to issue subpoenas,[26] we find no due process violation. "[A party's] inability to subpoena witness[es] is not a per se violation of his right to procedural due process." (*U.S.* v. *Woods* (E.D.Va. 1996) 931 F.Supp. 433, 441.)

In *Wool* v. *Maryland-Nat. Capital Park & Plan. Com'n*, *supra*, 664 F.Supp. 225, the defendant commission eliminated the plaintiff's job (deputy general counsel) and terminated his employment. He filed a grievance alleging that the 10-member commission had illegally abolished his position. The executive director denied the grievance, and the plaintiff appealed to the merit system board. In connection with the hearing before the board, the plaintiff sought to compel the attendance of the individual commissioners, but the board had no subpoena power. Only one of the ten commissioners appeared at the hearing. The board affirmed the executive director's denial of the grievance. The plaintiff then filed suit in federal court, alleging that the board's lack of subpoena power violated his due process rights. The court rejected that argument, stating:

"This Court is satisfied that plaintiff was afforded at least the minimum due process required under the circumstances of this case. Plaintiff received

---

[26]The Mohilefs have pointed to no state or local law authorizing the AZA or the Board to issue subpoenas. In that regard, their reliance on section 19.33 of the Los Angeles Administrative Code is misplaced. Section 19.33 permits the issuance of subpoenas in matters to be heard by the governing boards of certain City departments. (L.A. Admin. Code, §§ 19.24-19.33; L.A. Charter, § 70.) Neither the AZA nor the Board is such a governing board. (L.A. Charter, § 70.)

ample notice regarding the abolishment of his job, as well as an adequate opportunity to present his complaint to the Merit System Board. . . .

"Plaintiff chose to file a formal grievance with the Executive Director. Upon its denial, he appealed to the Merit System Board. Plaintiff was granted two days of hearings. He submitted numerous documentary exhibits, called witnesses, cross-examined opposition witnesses, submitted legal memoranda for consideration, and received a nine-page opinion from the Board. Although it is unclear whether plaintiff had the benefit of counsel, he is an experienced attorney. Plaintiff also enjoyed the right to appeal the adverse decision through the Maryland judicial system. These procedures surely satisfied the minimum due process required under the Fourteenth Amendment. . . .

"Plaintiff contends that despite these procedural protections, his inability to compel the Commissioners to appear and testify constituted a denial of due process. This Court agrees that in a perfect world, the Merit System Board would possess the power to subpoena witnesses, and plaintiff would have been able to confront all Commissioners who played a role in abolishing his job. But lack of subpoena power is not *per se* denial of due process. . . . Plaintiff Wool possessed other means to present his case. One Commissioner did attend the hearing, and plaintiff apparently had the opportunity to question him about the decision to abolish the Deputy General Counsel position. Moreover, plaintiff called witnesses to testify about the unusual nature of the decision to abolish his position. He argued to the Board that the Commissioners' refusal to testify at the hearing created the inference that they had nothing to say in defense of their action to abolish his job. The Board considered all this evidence, yet did not agree with plaintiff's conclusions.

"If the Board had possessed subpoena power, plaintiff would have enjoyed an additional avenue through which to present evidence in his case. But in light of the other means available to plaintiff, this Court is not convinced that the lack of subpoena power denied plaintiff the minimum procedural protections required by the Fourteenth Amendment." (664 F.Supp. at pp. 230-231, citations and fn. omitted; accord, *Prebble* v. *Brodrick* (10th Cir. 1976) 535 F.2d 605, 615-616; *U.S.* v. *Woods, supra,* 931 F.Supp. at p. 441.)

Due process may require an agency to subpoena witnesses where, absent their testimony, the agency's ultimate decision would be based solely on their written reports. (See *McLeod* v. *Board of Pension Commissioners, supra,* 14 Cal.App.3d at pp. 25-29 [in a proceeding to determine petitioner's

entitlement to disability benefits, board of pension commissioners must issue subpoenas to physicians who had submitted written reports].) But that is not the situation here. Indeed, on appeal, the Mohilefs have provided us with no information about who they wished to subpoena or what those witnesses might have said.[27] In any event, at the public hearings, the Mohilefs were allowed to present documentary evidence, the testimony of witnesses who voluntarily appeared, and the arguments of their attorney. In addition, at the Mohilefs' request, officials appeared from the departments of animal regulation and building and safety, and the AZA allowed the Mohilefs' attorney to question them. After the AZA rendered his decision, the Mohilefs were provided with additional administrative appeals as well as judicial review. In these circumstances, we conclude that the Mohilefs received adequate notice of the nature of the administrative proceeding and a meaningful opportunity to respond to the nuisance charges. Accordingly, due process was satisfied despite the refusal (or inability) of the AZA and the Board to issue subpoenas.

### B. *The Merits of the Administrative Decisions*

██ ██ ██ ██ A trial court may issue a writ of administrative mandate where an agency has (1) acted in excess of its jurisdiction, (2) deprived the petitioner of a fair hearing, or (3) committed a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [agency] has not proceeded in a manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

If an administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment in evaluating the evidence and must issue a writ of mandate if the agency's findings are not supported by the weight of the evidence. (*Goat Hill Tavern* v. *City of Costa Mesa, supra,* 6 Cal.App.4th at p. 1525.) We review such a trial court determination under the substantial evidence test.[28]

On the other hand, if the administrative decision does not substantially affect a fundamental vested right, the trial court considers only whether the

---

[27] According to the City, the Mohilefs wanted the AZA and the Board to subpoena an individual whose testimony might have impeached the motives of one of the complaining property owners. Assuming this to be the case, the impeachment of a single witness would not have affected the testimony of the remaining witnesses, all of whom testified consistently as to the problems caused by the ostriches and emus.

[28] Under the substantial evidence test, " '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. . . . 'We must therefore view the evidence in the light most favorable to the prevailing party, giving [it] the benefit of every reasonable inference and resolving all conflicts in [its] favor . . . .' " (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133], citations omitted.) "[T]he focus is on the quality,

agency's findings are supported by substantial evidence in light of the whole record. (*Goat Hill Tavern* v. *City of Costa Mesa, supra,* 6 Cal.App.4th at pp. 1525-1526.) On appeal, we review the administrative decision itself (not the decision of the trial court) to determine if it is supported by substantial evidence. (*Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 501 [210 Cal.Rptr. 788].)

The Mohilefs contend that under either standard, the trial court erred in failing to issue a writ of mandate. We agree. Moreover, regardless of which standard is applied to an agency's findings of fact, we review questions of law de novo. (See *Riveros* v. *City of Los Angeles, supra,* 41 Cal.App.4th at pp. 1348-1350; *Jefferson* v. *Compton Unified School Dist., supra,* 14 Cal.App.4th at pp. 37-38.; *Brotherhood of Teamsters & Auto Truck Drivers* v. *Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1525 [236 Cal.Rptr. 78].) As it turns out, the Mohilefs raise only questions of law in challenging the merits of the administrative decisions, so we review those decisions independently.

### 1. *Protection for Preexisting Agricultural Uses*

■ Under Civil Code section 3482.5, "No agricultural activity, operation, or facility . . . conducted or maintained for commercial purposes, and in a manner consistent with proper and accepted customs and standards, as established and followed by similar agricultural operations in the same locality, shall be or become a nuisance, private or public, due to any changed condition in or about the locality, after it has been in operation for more than three years if it was not a nuisance at the time it began." (Civ. Code, § 3482.5, subd. (a)(1).)

The Mohilefs argue that this statute shields their bird farming activities from the City's nuisance abatement ordinance. We disagree. To receive the protection of Civil Code section 3482.5, the activity at issue must be conducted in a manner consistent with accepted standards, as established by similar agricultural operations in the same locality. The Mohilefs offered no evidence to satisfy this statutory prerequisite. In addition, the particular use must have been in existence for more than three years. The Mohilefs also failed to satisfy this criterion. While the record indicates that ratites have

---

not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 871-872 [269 Cal.Rptr. 647].) Of course, "[t]rial court findings must be supported by substantial evidence *on the record taken as a whole.* Substantial evidence is not [literally] *any* evidence—it must be reasonable in nature, credible, and of solid value." (*Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51 [26 Cal.Rptr.2d 834, 865 P.2d 633], italics added.)

been on the ranch *intermittently* since 1981, nothing in the record indicates that the present operation—consisting of 800 ostriches and emus—has existed for the minimum statutory time period. If anything, the record supports the conclusion that the bird farming activities commenced sometime in 1993, approximately one year before the City declared the operation to be a public nuisance.

Thus, Civil Code section 3482.5 did not preclude the City from declaring the Mohilefs' bird farming activities to be a public nuisance.

### 2. Overbreadth of the Administrative Decisions

■ The Mohilefs complain that the decisions of the AZA and the Board were overbroad in their use of the term "ratite" since the case actually concerns only two types of ratites, i.e., ostriches and emus. (See fn. 4, *ante* [describing ratites].) The AZA limited the number of "ratites" to 195, and the Board directed that no "ratites" be kept at the ranch. A literal reading of these directives would preclude the Mohilefs from keeping a single kiwi bird (which is about the size of a chicken) on their property.

However, we do not interpret the language of the administrative decisions so literally. A reading of the AZA's decision in its entirety makes clear that he simply used the word "ratite" as a shorthand reference to ostriches and emus. For instance, the very first sentence of his decision states that "the past operation of **the keeping of ratites (emus and ostriches)** has adversely affected the health, peace or safety of persons in the surrounding area . . . ." (Boldface in original.) There was no substantial evidence in the record concerning the possible nuisance effects of any type of ratite other than ostriches and emus. Accordingly, we conclude that the AZA and the Board used the term "ratite" to refer to the two types of birds at issue in the proceedings. Other types of ratites were not covered by either decision.

### 3. Maintenance of an "Ostrich Farm" as a Nonconforming Use

■ The City contends that an "ostrich farm" is not permitted in an "A-1" agricultural zone, and the Board therefore properly determined that no ostriches were allowed on the Mohilef property. According to the City, ostrich farms are allowed only in "M-2" and "M-3" industrial zones.

We need not reach the merits of this contention because it was not properly raised in the administrative proceeding. The zoning administrator's notice of hearing indicated that the sole basis for the administrative proceeding would be the City's nuisance abatement ordinance (L.A. Mun. Code,

§ 12.21A.15).[29] A nuisance abatement proceeding assumes that the challenged use complies with existing zoning laws, i.e., it is a permitted or conforming use (albeit one which is allegedly causing harm to the public). As stated, due process requires adequate notice of the nature of the administrative proceeding and a meaningful opportunity to be heard on the matter. (See *Horn* v. *County of Ventura, supra,* 24 Cal.3d at p. 612; *Logan* v. *Zimmerman Brush Co., supra,* 455 U.S. at pp. 428-430 & fn. 5 [71 L.Ed.2d at pp. 727-724].) The City did not provide notice or an opportunity to be heard on the question of whether the Mohilefs' ostrich farm was a nonconforming use. Thus, the City's contention does not provide a basis for affirming the trial court.

### 4. *The Board's Discontinuance of the Mohilefs' Bird Farming Activities*

The AZA ordered that the Mohilefs reduce the number of ostriches and emus to 195. On appeal, the Board modified that condition by reducing the number to zero. The Mohilefs contend that the Board's discontinuance of their bird farming activities violates the nuisance abatement ordinance. We agree.

By imposing a total prohibition on ratites, the Board violated two provisions in the nuisance abatement ordinance. First, a use cannot be discontinued unless "prior governmental efforts to cause the owner or lessee to eliminate the problems associated with the premises have failed . . . and . . . the owner or lessee has failed to demonstrate, to the satisfaction of the [Zoning] Administrator, the willingness and ability to eliminate the problems associated with the premises." (L.A. Mun. Code, § 12.21A.15(b).) Second, although "[a]n appeal from the action of the Administrator may be taken to the Board of Zoning Appeals and to the City Council . . . , only the Administrator may require the discontinuance of a use." (*Ibid.*)

In this case, the AZA's decision—which reduced the number of ratites to 195—was the first governmental effort to eliminate the nuisance problems associated with the Mohilefs' bird farming activities. Thus, not even the AZA had the authority after the first public hearing to order that all ratites be removed from the property. Moreover, regardless of the AZA's authority, the ordinance expressly precludes the Board from ever ordering the discontinuance of a use. Although the Board may modify or reverse the AZA's decision (L.A. Mun. Code, § 12.28A.8)), it cannot impose a total prohibition on the activity at issue, as it did here.

---

[29]As the AZA stated at the public hearing: "The only issue I'm looking at is essentially is there a nuisance? And if so, what can be done? If there is no nuisance, then nothing needs to be done."

Because the Board abused its discretion in ordering that the Mohilefs' bird farming activities be completely discontinued, the trial court should have issued a writ of mandate directing the Board to vacate its decision and to render another determination consistent with the limitations on its authority.

 Given that this case is going back to the Board, we consider it prudent to address an issue raised by the Mohilefs with respect to the prior Board proceeding: whether the Board improperly conducted a de novo hearing on the nuisance issue. We conclude that it did not do so. The mere fact that the Board held a public hearing, as it was required to do (L.A. Mun. Code, § 12.28A.5), does not mean that it was disregarding the AZA's decision and deciding the case anew. The municipal code clearly provides that "[t]he Board shall base its determination only upon (i) evidence introduced at the hearing or hearings, if any, before the Zoning Administrator, on the issue, (ii) the record, findings and determination of the Zoning Administrator, or (iii) the consideration of arguments, if any, presented to the Board orally or in writing." (*Id.*, § 12.28A.7(b).)

At the beginning of the public hearing, the Board's chairman did state that the Board would allow witnesses to offer evidence that had *not* been presented to the AZA. That comment was understandable since, as a practical matter, it would be difficult for the Board to operate otherwise. By way of example, there may be individuals at the Board hearing who have no idea what was said at the hearing before the AZA. Such persons should be allowed to speak before the Board even if they unknowingly refer to something not mentioned before the AZA. It then falls to the Board to determine if any new evidence was offered at the hearing.

However, while new evidence may be *offered* at a Board hearing, the Board cannot *rely* on that evidence in deciding the appeal. As to new evidence, the municipal code provides: "If an applicant or aggrieved person wishes to offer into the proceedings any new evidence in connection with the matter, a written summary of such evidence together with a statement as to why such evidence could not reasonably have been presented to the Zoning Administrator shall be filed with the Board. If the Board determines that such evidence could not reasonably have been presented to the Zoning Administrator and is of such nature as might reasonably have led to a different determination by the Zoning Administrator, the Board shall remand the matter to the Zoning Administrator, who shall reopen the matter only for receipt of evidence summarized to the Board together with evidence from other parties relative thereto and within 55 days make a new order, requirement, decision, interpretation or other determination in the matter." (L.A. Mun. Code, § 12.28A.7(b).) We have no reason to believe that the Board will violate this provision when it reconsiders its prior decision on remand.

In closing, we note that our disposition of this case makes it unnecessary to decide whether the trial court properly excluded certain evidence which the Mohilefs had not presented during the administrative proceeding. Since the Board will be required to reconsider its decision, the Mohilefs will have an opportunity to introduce the new evidence at that time, consistent with the established procedure for doing so. (Of course, evidence concerning whether an administrative proceeding was procedurally fair may be considered by the trial court on a writ petition even though that evidence was not presented at the administrative level. (See *Clark* v. *City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169-1170 & fn. 17 [56 Cal.Rptr.2d 223].) Further, we need not reach the questions of whether the Mohilefs were engaged in a commercial or industrial activity or whether that activity constituted a public nuisance. Although the City discussed those issues in its respondents' brief, the Mohilefs did not raise them. Accordingly, those issues have been abandoned. (See *Interinsurance Exchange* v. *Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126]; *Dills* v. *Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].)

### DISPOSITION

The judgment is reversed. On remand, the trial court is directed to issue a writ of administrative mandate commanding the board of zoning appeals to set aside its decision and to issue a new determination consistent with sections 12.21A.15(b) and 12.28A.7(b) of the Los Angeles Municipal Code. Appellants are entitled to costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

Appellants' petition for review by the Supreme Court was denied February 26, 1997.