Filed 10/17/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| EVERET GORDON MILLER et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF REAL ESTATE et al., <br><br>     Defendants and Respondents. | B311510 <br><br> (Los Angeles County Super. Ct. No. 19STCP00490) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Klinkert, Gutierrez & Neavel, James E. Klinkert, Paul J. Gutierrez and Kelly J. Neavel for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Tamar Pachter, Senior Assistant Attorney General, Brian D. Wesley, Supervising Deputy Attorney General, and Anna Barsegyan, Deputy Attorney General, for Defendants and Respondents.

# INTRODUCTION

Nijjar Realty, Inc. and its real estate broker of record, Everet Miller, operated a mobilehome park owned by one of Nijjar's clients. The Department of Real Estate filed an accusation alleging Nijjar violated various provisions of the Real Estate Law (Bus. & Prof. Code, § 10000 et seq.),[1] the Health and Safety Code, and administrative regulations under the Health and Safety Code by (1) employing an unlicensed individual to solicit and enter into lease-to-own agreements with the tenants/buyers of several mobilehomes; and (2) permitting the tenants/buyers to move into mobilehomes that were not permitted for human occupancy. Following a hearing, an administrative law judge ruled Nijjar violated the statutes and regulations. The administrative law judge issued a proposed order revoking Nijjar Realty's and Miller's licenses, which the Department adopted.

Nijjar and Miller filed a petition for a writ of administrative mandate, contending they did not receive a fair hearing because the administrative law judge considered improper evidence, including expert testimony from several witnesses the Department did not designate as experts. Nijjar and Miller also contended the administrative law judge erred in ruling they violated statutes in the Business and Professions Code and the Health and Safety governing the sale and occupancy of mobilehomes.

The trial court denied the petition, ruling that the administrative law judge did not consider any improper evidence

---

[1]     Undesignated statutory references are to the Business and Professions Code.

and, after conducting an independent review of the evidence, that Nijjar and Miller violated the applicable statutes. Nijjar and Miller appeal, making the same arguments they made in the trial court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Department Files an Accusation Against Nijjar and Miller*

Nijjar maintained and managed the Four J's Trailer Park in Oildale, California. A separate entity, Cobra 28 No. 7, LP, owned the mobilehome park. In 2018 the Department filed an accusation against Nijjar and Miller. The Department alleged, as relevant here, Nijjar violated two provisions of the Real Estate Law: (1) section 10137, which prohibits a broker from retaining and compensating a person who acts as a broker without a license (§§ 10130-10131.4, 10137), and (2) section 10131.6, subdivision (b), which prohibits a real estate broker from maintaining a place of business "where two or more . . . mobilehomes are displayed and offered for sale" by the broker unless the broker also has a mobilehome dealer license issued by the Department of Housing and Community Development (HCD) (§ 10136, subd. (d); see Health & Saf. Code, § 18000, et seq.). The Department alleged Nijjar violated these statutes by "employ[ing] and compensate[ing]" Jose Rodriguez, an unlicensed person, to represent the seller of mobilehomes at the park in three separate "lease to own agreement[s]." The Department also alleged Nijjar, in violation of several provisions of the Health and Safety Code and related HCD regulations, "allowed immediate residential occupancy" of several mobilehomes at the park that were "not

3

authorized for human occupancy," including those offered in the lease-to-own agreements.

  B.  *The Administrative Law Judge Conducts a Hearing*

    1.  *Nijjar and Miller File a Motion To Exclude the Department's Evidence, Which the Administrative Law Judge Denies*

  Prior to the hearing, the administrative law judge issued a conference order requiring the Department and Nijjar and Miller to file and exchange witness and exhibit lists 19 days before the hearing.  The order stated that, "at the discretion of the Administrative Law Judge, failure to comply . . . shall be grounds to exclude exhibits from evidence and to bar witnesses from testifying."

  The Department filed a prehearing statement identifying potential witnesses and exhibits, but did not file a final witness and exhibit list until five days before the hearing.  Nijjar and Miller filed a motion asking the administrative law judge to preclude the Department from "offering any exhibits" or "offering the testimony of any witnesses" during the hearing (effectively, a terminating sanction), or in the alternative, to prohibit the Department from introducing any expert opinion testimony.  The administrative law judge denied the motion because (1) the Department in its prehearing statement had given Nijjar and Miller copies of all the documents it intended to use as exhibits and identified its witnesses and (2) the Department represented to the administrative law judge that none of its witnesses would offer expert opinion testimony.

4

Nijjar and Miller filed a separate motion to exclude evidence that, after Rodriguez executed the lease-to-own agreements with the tenant/buyers of the mobilehomes, one of the mobilehomes caught fire, killing an infant. The administrative law judge denied the motion because the Department represented it only intended to show that the fire "brought the state agencies . . . to the site," not that Nijjar caused the fire.

2.      *The Department Presents Evidence That Residents Occupied Unpermitted Mobilehomes*

The HCD, in addition to issuing mobilehome dealer licenses, generally regulates the operation of mobilehome parks. (See Health & Saf. Code, § 18200 et seq.) Robert Martinez, a representative of the Codes and Standards Division of the HCD, testified that in 2015 Four J's obtained permits to install certain electrical infrastructure at the park, before installing any mobilehomes. In January 2016, however, Martinez inspected the park and "discovered people living in some mobile home units that had not undergone an inspection," and for which no one had applied for permits. Martinez issued Nijjar a "Notice of Violation" that stated seven mobile homes had been installed without a permit and that instructed Nijjar to correct the violations. Miller admitted at the hearing he "did not know . . . one way or the other" whether the mobilehomes were permitted for human occupancy.

About three weeks after Martinez inspected the park, one of the unpermitted mobilehomes caught fire. Martinez inspected the park again and found the mobilehome that caught fire was "completely destroyed." An adjacent mobilehome was also

5

"totally" destroyed, and another was "partially" destroyed. Martinez issued Nijjar a new notice of violation, stating that the remaining mobilehomes "shall be vacated immediately" and that "the mobilehome units shall not be occupied until . . . inspected and approved for occupancy . . . ."

### 3. *The Department Presents Evidence of the Lease-to-own Agreements*

George Jediny, an investigator for the HCD, interviewed Rodriguez at the park in February 2016. Rodriguez told Jediny that Nijjar employed him as the manager of Four J's Trailer Park.

The Department submitted three contracts Rodriguez executed in the fall of 2015 on behalf of Nijjar. Each contract designated Nijjar as the "Landlord" and the other party as the "Tenant." The contracts included a form titled "Rental Lease Agreement with Option To Purchase," which stated the tenants would pay Nijjar $325 a month "as rent for the Premises . . . ." The form also included a provision, under the heading "Option to Purchase," which stated Nijjar "grant[ed] Tenant the exclusive right to an option to purchase the Premises" for a price (either $7,000 or $10,000, depending on the contract), beginning with the term of the lease and expiring upon termination of the lease. The provision also stated that the tenant would "deposit with [Nijjar] the sum of $1,000 as a deposit towards the purchase price of the Premises" and that the tenant would pay a certain amount each month (either $150 or $325), "which include[d] principal and interest at 10% annum, on the unpaid balance . . . ." During their interview, Rodriguez explained to Jediny that the tenants paid $325 a month to rent the space in the mobilehome park and

for utilities, plus an additional sum toward the principal on the mobilehome.

Ernie Ruiz, an investigator for the Department of Real Estate, also interviewed Rodriguez. Rodriguez described for Ruiz the process he followed in obtaining tenants for the lease-to-own agreements. If a prospective tenant was interested in a mobilehome, Rodriguez would inform the tenant it was "available for sale" and give the tenant the keys to the mobilehome. The tenant would then look at the mobilehome, although Rodriguez said he "wouldn't actually physically show" it. If the tenant wanted the mobilehome, Rodriguez would fax the tenant's credit application to his supervisors at Nijjar, who would decide whether to approve the application.

Jediny testified Rodriguez did not have a license issued by the HCD (i.e., a mobilehome dealer license), and Ruiz testified Rodriguez did not have a license issued by the Department of Real Estate. Ruiz also stated Nijjar and Miller had licenses issued by the Department of Real Estate but not by the HCD. Miller admitted at the hearing Nijjar did not have a license issued by the HCD because, according to Miller, "[n]one was required."

4.      *The Administrative Law Judge Rules Nijjar Violated the Applicable Statutes, and the Department Revokes Nijjar's Licenses*

The administrative law judge found that, at all relevant times, Nijjar "operated and managed" the Four J's Trailer Park and "employed Rodriguez as the on-site manager" of the park. The administrative law judge found Nijjar, through Rodriguez, "represented the seller" of a mobilehome at the park on three

7

separate occasions where mobilehomes "were leased with an option of ownership after [the tenants] had paid off the principal balance."[2]  Therefore, the administrative law judge ruled, Nijjar "employed and compensated unlicensed Rodriguez, to perform real estate activities . . . in violation of section 10137."  The administrative law judge further found Nijjar "sold more than two mobilehomes in the same park without possessing a dealer license . . . in violation of section 10131.6, subdivision (b)."

Finally, the administrative law judge found Nijjar did not have the "installation and occupancy" permits required by several provisions of the Health and Safety Code and related HCD regulations.  The administrative law judge rejected Nijjar and Miller's contention that only the "owner" of the mobilehomes could be held liable for the permit violations, ruling Nijjar was liable because it acted as "on-site management of the Park, including allowing the unpermitted homes to be occupied . . . and selling [the] mobilehomes."

The administrative law judge ruled that, in light of Nijjar's violations, there was sufficient cause under the Real Estate Law to revoke Nijjar's and Miller's licenses.  (See §§ 10176, subd. (m), 10177, subds. (d), (g), & (h).)  The administrative law judge concluded it was appropriate to revoke the licenses because Nijjar and Miller "did not take any responsibility for the unlicensed sale and occupancy of mobilehomes at the park" and presented no evidence they had implemented any policies or procedures that

---

[2]     When Rodriguez executed the lease-to-own agreements, each mobilehome had a registered owner different from Nijjar. The trial court ruled it was "unclear based on the evidence presented at hearing who were the owners of the individual mobilehomes . . . ."

8

would prevent similar violations in the future.  The commissioner adopted the administrative law judge's findings and order and revoked Nijjar's and Miller's licenses.

C.    *Nijjar and Miller File a Petition for Writ of Administrative Mandate, Which the Trial Court Denies*

Nijjar and Miller filed a petition for writ of administrative mandate arguing, as relevant here, the administrative law judge and the Department erred in several ways.  First, they contended they did not receive a fair hearing because Martinez, Jediny, and Ruiz gave expert opinion testimony, even though the Department did not designate them as expert witnesses.  Second, Nijjar and Miller argued the administrative law judge erred in ruling Nijjar violated the Real Estate Law by employing Rodriguez to execute the lease-to-own agreements because, according to Nijjar and Miller, the contracts "were leases, not sales agreements," and the law did not prohibit an unlicensed person from "accept[ing]" lease agreements on behalf of Nijjar.  Third, Nijjar and Miller contended the administrative law judge erred in ruling Nijjar violated the provisions of the Health and Safety Code and HCD regulations requiring mobilehomes to be permitted for human occupancy because, again according to Nijjar and Miller, only the owner of a mobilehome or mobilehome park is liable for failing to obtain the required permits.  Finally, Nijjar and Miller argued that the administrative law judge erred in admitting evidence of the fire that killed the infant and that the Department "obviously based its decision" to revoke Nijjar's and Miller's licenses "on its subjective belief in the unproven allegation that [they] caused the death of an infant."

The trial court denied the petition. The court ruled Nijjar and Miller received a fair hearing because Martinez, Jediny, and Ruiz did not give expert opinion testimony—they gave testimony based only on their perceptions as investigators. The court also ruled that, even if the witnesses offered some expert opinion testimony, the administrative law judge's rulings were based on the non-opinion testimony and on her independent legal conclusions about the applicable statutes and regulations, and Nijjar and Miller had sufficient notice of the expected testimony and an opportunity to respond.

Next, the court conducted an independent review of the record, concluded the weight of the evidence supported the administrative law judge's finding the contracts were lease-to-own agreements, and ruled Nijjar violated section 10131.6, subdivision (b), and section 10137 by allowing Rodriguez to sign the contracts without a license. The court also ruled that the weight of the evidence supported the administrative law judge's finding Nijjar "allowed unpermitted residential occupancy of the [p]ark's mobilehomes" and that the applicable law did not impose the obligation to obtain a permit for human occupancy "solely on the owner of the mobile home." Finally, the trial court rejected Nijjar and Miller's assertion the administrative law judge improperly admitted or based its decision on the fact a fire in one of the mobilehomes killed an infant. The court stated that the Department did not charge Nijjar or Miller with causing the fire and that the administrative law judge "made no finding about causation." Nijjar and Miller timely appealed from the judgment denying the petition.

10

**DISCUSSION**

A. *Applicable Law and Standard of Review*

"Before suspending or revoking a license," the Department must hold a formal hearing under the Administrative Procedures Act. (§ 10100; see Gov. Code, § 11500 et seq.) An aggrieved licensee may file a petition for a writ of administrative mandate to challenge the Department's decision to suspend or revoke a real estate license. (See Code Civ. Proc. § 1094.5; *Singh v. Davi* (2012) 211 Cal.App.4th 141, 147; *Amvest Mortgage Corp. v. Antt* (1997) 58 Cal.App.4th 1239, 1242-1243.) "'"The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged 'proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. . . . [A]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'"'" (*Tran v. County of Los Angeles* (2022) 74 Cal.App.5th 154, 206; see *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34.)

B. *Nijjar and Miller Received a Fair Hearing*

For purposes of section 1094.5, "'[t]he "fair trial" requirement is equivalent to a prescription that there be a fair administrative hearing.'" (*Mountainlands Conservancy, LLC v. California Coastal Com.* (2020) 47 Cal.App.5th 214, 235; accord, *Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1143; *Lateef v. City of Madera* (2020)

11

45 Cal.App.5th 245, 252.) "Because the ultimate determination of procedural fairness presents a question of law, we 'review the fairness of the administrative proceeding de novo.'" (*Sweeney*, at p. 1143; see *Sinaiko v. Superior Court* (2004) 122 Cal.App.4th 1133, 1140 [we "independently review the fairness of the administrative proceedings as a question of law"].)

Nijjar and Miller argue they did not receive a fair hearing for two reasons: (1) the administrative law judge allowed the Department's three witnesses, Martinez, Jediny, and Ruiz, to give expert opinion testimony, and (2) the Department's decision to revoke Nijjar's and Miller's licenses was based on the Department's belief they caused the fire, not on the evidence the Department presented at the hearing. Neither contention has merit.

1. *The Testimony by Martinez, Jediny, and Ruiz Did Not Deprive Nijjar of a Fair Hearing*

Nijjar and Miller contend they did not receive a fair hearing because, while the Department "did not properly identify any expert witnesses" prior to the hearing and represented at the hearing that "no expert opinion testimony would be offered," the testimony of all three witnesses—Martinez, Jediny, and Ruiz— "went far beyond permissible lay witness opinion." Nijjar and Miller primarily object to testimony by each witness that Nijjar violated the HCD's or Department of Real Estate's licensing requirements, and testimony by Ruiz that the lease-to-own agreements were "sales" agreements. Nijjar and Miller assert the admission of this testimony was "a denial of due process."

As an initial matter, Nijjar and Miller cite the wrong legal standard governing their contentions. They cite authority

12

governing the admissibility of opinions by non-expert witnesses in civil and criminal trials and assume the same rules apply in administrative proceedings. They don't. As the trial court correctly observed, a hearing under the Administrative Procedure Act "need not be conducted according to technical rules relating to evidence and witnesses," unless expressly required by the Act. (Gov. Code, § 11513, subd. (c); see *McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054 ["[a]n administrative agency is not required to observe the strict rules of evidence enforced in the courts"].) In particular, the APA, unlike the Code of Civil Procedure, does not prohibit a witness from providing expert opinion testimony on the ground the proponent of the testimony did not timely exchange with the opposing party certain information about the witness. (Cf. Code Civ. Proc., § 2034.300).[3] Instead, in administrative hearings "[a]ny relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions." (Gov. Code, § 11513, subd. (c).) Nijjar and Miller do not present any argument why, even assuming Martinez, Jediny, and Ruiz gave some expert opinion testimony, their testimony was the type of testimony responsible persons are

---

[3] The APA does have a provision authorizing the administrative law judge to address the exchange of witness lists and exhibits during a prehearing conference, as the administrative law judge did here, but nothing requires the administrative law judge to exclude a witness's testimony if a party fails to comply with a prehearing order. (See Gov. Code, § 11511.5.)

not accustomed to rely on.  Nor do Nijjar and Miller cite any other provision of the APA that would preclude the administrative law judge from considering such testimony.[4]

Even if some of the challenged testimony amounted to expert opinion testimony, the administrative law judge did not violate Nijjar's or Miller's due process rights.  "'The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against and opportunity to meet it."'  [Citations.]  The opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner.'"  (*Today's Fresh Start, Inc. v. Los Angeles County* (2013) 57 Cal.4th 197, 212 (*Today's Fresh Start*).)  To identify ""'the quantum and quality of the process due in a particular situation'" . . . the United States Supreme Court in [*Mathews v. Eldridge* (1976) 424 U.S. 319, 335, [96 S.Ct. 893, 47 L.Ed.2d 18] (*Mathews*)]" identified three factors courts must balance:  "'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

---

[4]    One court has held that a party to an administrative proceeding who seeks to introduce expert opinion testimony based on a new scientific method of proof must satisfy the requirements of *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 by showing the procedure has been generally accepted as reliable in the scientific community in which it was developed.  (See *Seering v. Department of Social Services* (1987) 194 Cal.App.3d 298, 311.)  None of the witnesses' testimony here was based on a scientific method or procedure.

administrative burdens that the additional or substitute procedural requirement would entail.'" (*Today's Fresh Start*, at pp. 212-213.) California courts "also consider a fourth factor, the "'dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official.'"" (*Id.* at p. 213)

Nijjar and Miller do not discuss any of the *Mathews* factors or cite any other authority governing when an administrative agency violates a person's or entity's due process rights; as discussed, Nijjar and Miller cite only authority governing when a witness may give opinion testimony in civil and criminal trials. For that reason alone, they have not shown a due process violation. (See *Mathews v. Eldridge*, *supra*, 424 U.S. at pp. 348-349 ["The judicial model of an evidentiary hearing is neither a [constitutionally] required, nor even the most effective, method of decisionmaking in all circumstances."]; *Mohielf v. Janovici* (1996) 51 Cal.App.4th 267, 288 [same].)

In any event, there was no due process violation. Under the first *Mathews* factor, Nijjar and Miller certainly had a significant interest in retaining their real estate license and were entitled to a number of procedural protections before the Department could revoke them. But Nijjar and Miller have not shown how the Department's failure to designate Martinez, Jediny, and Ruiz as expert witnesses prior to the hearing seriously "risk[ed] . . . an erroneous deprivation of such interest." (*Today's Fresh Start, supra*, 57 Cal.4th at p. 213; see *Acott Ventures, LLC v. Alcoholic Bev. Control Bd.* (D.C.Ct.App. 2016) 135 A.3d 80, 90 ["In accordance with the relaxed rules on the admissibility and competence of evidence, . . . opinion testimony

15

may be admitted at an administrative hearing with or without a witness's formal and fully supported certification as an expert and may be considered as the agency reasonably deems appropriate in making its findings and conclusions on contested matters."].)  And Nijjar and Miller received numerous procedural protections.  For example, although the Department did not formally designate the witnesses as experts, in its prehearing conference statement filed six weeks before the hearing, the Department identified them as witnesses it intended to call and described their expected testimony.  The Department stated that Martinez and Jediny would "testify about the inspections, reports, and actions taken by HCD" and that Ruiz would testify about the evidence obtained during the Department of Real Estate's investigation.  The Department also identified as an exhibit a report authored by Jediny.  In the report Jediny referred to and described the notices of violation Martinez issued to Nijjar (which Martinez testified about at the hearing) and described in detail Nijjar's violations of the HCD's licensing requirements, which Jediny testified about.

Nijjar and Miller had the opportunity to and did cross-examine each of the witnesses.  And the administrative law judge allowed Nijjar and Miller's expert witness to testify about how Nijjar's conduct did not violate the applicable licensing provisions.  The trial court correctly ruled Nijjar and Miller had sufficient notice of the witnesses' anticipated testimony and a reasonable opportunity to respond.  That is all due process requires.  (See *Mathews, supra,* 424 U.S. at p. 349 ["All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard' [citation] to insure that they are given a

16

meaningful opportunity to present their case."]; *Mohielf v. Janovici*, *supra*, 51 Cal.App.4th at p. 289 [same].)

Finally, any error in admitting the testimony Nijjar and Miller complain about was harmless. "'[I]t is well-settled that the improper admission or rejection of evidence at an administrative hearing does not provide "grounds for reversal unless the error has resulted in a miscarriage of justice. [Citation.] In other words, it must be reasonably probable a more favorable result would have been reached absent the error.""" (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200; see *Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1255.) Any such error ""'is not prejudicial if the evidence 'was merely cumulative or corroborative of other evidence properly in the record,' or if the evidence 'was not necessary, the judgment being supported by other evidence.""" (*Lone Star Security*, at pp. 1254-1255; see *McCoy v. Board of Retirement*, *supra*, 183 Cal.App.3d at p. 1054.)

As discussed, Nijjar and Miller primarily object to testimony by Martinez, Jediny, and Ruiz that Nijjar violated the HCD's and Department of Real Estate's licensing requirements and testimony by Ruiz that the lease-to-own agreements were "sales." The testimony was not necessary to the judgment because the trial court independently considered the evidence on which those opinions were based; the language of the lease-to-own agreements and Rodriguez's admissions about their terms; Rodriguez's admission to Jediny that he did not have a license issued by either the Department or the HCD; Miller's admission at the hearing he did not have a license issued by the HCD; and

17

Martinez's testimony no one applied to the HCD for occupancy permits for the mobilehomes.[5]

>     2.     *The Evidence of the Fire Did Not Deprive Nijjar*
>             *and Miller of a Fair Hearing*

Nijjar and Miller next contend that, although "the administrative hearing ostensibly had nothing to do" with the fire in the mobilehome that killed the infant, the Department "obviously" revoked Nijjar's and Miller's licenses because of its "subjective belief in the unproven allegation that [they] caused the death . . . ."  In its closing brief in the administrative hearing, the Department did argue Nijjar's and Miller's "complete disregard for all Health and Safety Code statutes and regulations . . . led to the death of an infant."  And in a memorandum of points and authorities filed in the trial court in opposition to Nijjar and Miller's request to stay the administrative law judge's decision, the Department argued Nijjar's and Miller's "bad acts

---

[5]     Nijjar and Miller also object to two other pieces of evidence they characterize as expert opinion testimony.  This first was testimony by Martinez and Jediny about the difference between mobilehomes and recreational vehicles.  There was no dispute, however, the units were mobilehomes.  When examined by the Department's lawyer at the hearing, Miller agreed the units were "mobilehomes" that "were leased and occupied."  The second was testimony by Jediny that the mobilehomes were in "substandard" condition.  Neither the trial court nor the administrative law judge, however, found Nijjar violated any statutes or regulations because the mobilehomes were in substandard condition.

caused the death of a five-month-old baby, plus the incineration of three mobilehomes."

But even if the Department's decision to revoke Nijjar's and Miller's licenses was partially motivated by its belief Nijjar and Miller had some responsibility for the fire, Nijjar and Miller would still not be entitled to reversal of the judgment. Generally, "judicial comity and restraint preclude us from speculating about any ulterior motives [an agency] may have had in reaching its decision." (*San Diego Housing Com. v. Public Employment Relations Bd.* (2016) 246 Cal.App.4th 1, 12; see *Carter v. City of Los Angeles* (1948) 31 Cal.2d 341, 350 [in former employees' petition for writ of mandate seeking reinstatement,"[i]nquiry into extraneous facts merely to determine motive" of agency "would not be proper"]; *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1060-1061 [where a university student petitioned for a writ of administrative mandate to set aside his expulsion, "'mere belief that [a school official] acted with . . . ulterior motives [was] insufficient to state a claim for relief'"].) Regardless of the Department's motives, Nijjar and Miller received a fair trial. The Department did not attempt to show during the administrative hearing or in the trial court that Nijjar's or Miller's conduct caused the fire. Each of the Department's witnesses mentioned only briefly, as a background fact to explain the witness's investigation, that the fire occurred or that the infant died. None of the witnesses stated Nijjar's violations of the applicable statutes or regulations caused the fire or the death.

Moreover, the administrative law judge did not base her decision to revoke Nijjar's and Miller's licenses on the fire or the infant's death. (See *Pomona Valley Hospital Medical Center v.*

19

*Superior Court* (1997) 55 Cal.App.4th 93, 107 ["evidence of [a hospital's] motive in *initiating* [a physician's] suspension" was "not relevant to the issue of whether [the physician] had a fair administrative hearing"]; *Cole v. Los Angeles Community College Dist.* (1977) 68 Cal.App.3d 785, 792 [community college's purported "improper motivation" in commencing a proceeding to discharge an employee was irrelevant because "[i]t is the bias of the tribunal deciding a case, not the bias of the person instituting the proceeding that is important"].) The administrative law judge's stated grounds for revoking Nijjar's and Miller's licenses were that they did not accept responsibility for their violations or explain what policies they intended to adopt to prevent future violations. Nijjar and Miller have not shown the administrative law judge's conclusion was based on anything else outside the record. (Cf. *Andrews v. Agricultural Labor Rel. Bd.* (1981) 28 Cal.3d 781, 792 ["'Bias and prejudice'" of a decisionmaker "'are never implied and must be established by clear averments'"]; *Nick v. City of Lake Forest* (2014) 232 Cal.App.4th 871, 887 ["administrative decision makers are . . . presumed to be impartial"].)

      C.    *Substantial Evidence Supported the Trial Court's Finding There Were Grounds To Revoke Nijjar's and Miller's License*

          1.    *Standard of Review*

"A trial court reviewing the administrative decision of the Commissioner to revoke the license of a real estate broker . . . must exercise its independent judgment on the evidence underlying that decision and determine whether the

20

Commissioner's findings are supported by the weight of the evidence." (*California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1580; see *Amvest Mortgage Corp. v. Antt*, *supra*, 58 Cal.App.4th at pp. 1242-1243.)[6] Where, as here, "an appeal is taken from the trial court's determination" the weight of the evidence supported the commissioner's findings, "it is given the same effect as any other judgment after trial rendered by the court: the only question is whether the *trial court's* (not the administrative agency's) findings are supported by substantial evidence." (*Vaill v. Edmonds* (1991) 4 Cal.App.4th 247, 258; see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824; *Wallace*, at p. 1580.) Whether the trial court's findings support its legal conclusions is an issue of law we review de novo. (*County of Fresno v. Fresno Deputy Sheriff's Assn.* (2020) 51 Cal.App.5th 282, 288; *Holmes v. California Victim Compensation & Government Claims Bd.* (2015) 239 Cal.App.4th 1400, 1409; *Hi-Desert Medical Center v. Douglas* (2015) 239 Cal.App.4th 717, 730.)

The Department revoked Nijjar's and Miller's licenses for two categories of conduct: First, violating the Real Estate Law by

---

[6]    A trial court must "exercise[ ] its independent judgment upon the evidence" when reviewing a final administrative decision that substantially affects a fundamental vested right . . . ." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8; see *JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 964.) "Because the right to continue one's trade or profession is fundamental" (*Amvest Mortgage Corp. v. Antt*, *supra*, 58 Cal.App.4th at pp. 1242-1243), a "real estate broker's license is a 'vested' right" (*Milner v. Fox* (1980) 102 Cal.App.3d 567, 571, fn. 5).

retaining and compensating an unlicensed person, Rodriguez, to enter into the lease-to-own agreements; second, violating the Health and Safety Code and related HCD regulations by allowing residents to occupy mobilehomes the HCD had not permitted for human occupancy. Substantial evidence supported the trial court's findings that each category of conduct violated the applicable laws and justified revoking the licenses.

> 2. *Substantial Evidence Supported the Trial Court's Finding Nijjar Violated the Real Estate Law*

Section 10177 authorizes the commissioner of the Department to revoke a license if the licensee "[w]illfully disregarded or violated" the Real Estate Law (§ 10177, subd. (d)), "[d]emonstrated negligence or incompetence in performing an act for which the . . . person is required to hold a license" (§10177, subd. (g)), or "failed to exercise reasonable supervision over the activities of that licensee's salespersons" or a corporation for which the licensee is the designated broker (§ 10177, subd. (h)). The administrative law judge ruled there were grounds to revoke Nijjar's and Miller's licenses under section 10177 because Nijjar violated section 10137. Section 10137 provides: "It is unlawful for any licensed real estate broker to retain, compensate, directly or indirectly, any person for performing any of the acts within the scope of [Chapter 3 of the Real Estate Law] who is not a licensed real estate broker, or a real estate salesperson licensed under the responsible broker retaining or compensating him or her . . . ."

One of the acts within the scope of Chapter 3 is described in section 10131.6, subdivision (a): "[A] person licensed as a real estate broker may sell or offer to sell, . . . solicit prospective

22

purchasers of, . . . or negotiate the purchase, sale, or exchange of any manufactured home or mobilehome," subject to certain limitations. The trial court found Nijjar violated section 10137 because it employed Rodriguez, who did not have a license, to engage in the acts described in section 10131.6, subdivision (a).

Substantial evidence supported the trial court's finding. Rodriguez's employment agreement with Nijjar reflected that Nijjar paid him to act as the manager of the Four J's Park. Rodriguez admitted to Jediny he did not have a license issued by the Department of Real Estate or the HCD. The Department introduced three agreements Rodriguez executed, on behalf of Nijjar, with a tenant/buyer. In each agreement Nijjar leased a mobilehome to the tenant/buyer and purported to grant the tenant/buyer an option to purchase the mobilehome for a specified purchase price. Rodriguez also told Jediny that Nijjar paid him a bonus for leasing all of the mobilehomes in the park.

In their appellate briefs, the parties focus on and dispute whether Rodriguez, when he signed a lease-to-own agreement, "sold" or merely "leased" a mobilehome. The trial court (as well as the administrative law judge) characterized Rodriguez's conduct as "represent[ing] the sellers in the sale of mobilehomes." But the parties' dispute over whether the agreement was for a "sale" or a "lease" is beside the point. Section 10131.6, subdivision (a), encompasses not just selling, but "offer[ing] to sell" a mobilehome. Because each agreement included a form titled "Rental Lease Agreement with Option To Purchase," which "grant[ed] Tenant the exclusive right to an option to purchase" the mobilehome for a specified price, there is no question that, regardless of whether Rodriguez actually sold mobilehomes, he offered to sell them. Under California law, a "contract conferring

23

an option to purchase is an irrevocable and continuing offer to sell." (*Dawson v. Goff* (1954) 43 Cal.2d 310, 317; see *Steiner v. Thexton* (2010) 48 Cal.4th 411, 418 ["an option to purchase property is 'a unilateral agreement,'" in which the "'optionor offers to sell the subject property at a specified price or upon specified terms'"]; *City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45, 58 [under an option contract, the "'optionor has irrevocably promised upon the exercise of the option to perform the contract or make the conveyance upon the terms specified in his binding offer'"]; *Lawrence v. Settle* (1960) 182 Cal.App.2d 386, 388 ["As respects the purchase and sale of real property, an option is a unilateral offer by the owners to a prospective buyer to sell to the buyer within the time and under the conditions stated in the option."].)[7]

Substantial evidence also supported the trial court's finding Nijjar violated section 10131.6, subdivision (b). That provision

_____

[7] Nijjar and Miller contend Rodriguez was exempt from the license requirement under the exception in section 10131.01, subdivision (a)(3)(E). Section 10131.01, subdivision (a)(3), exempts an "employee of the property management firm retained to manage a residential apartment building or complex or court" from the general provision of the Real Estate Law that requires a person to have a license to lease real property (see § 10131, subd. (b)), if the employee only performs certain activities. One such activity is "[a]ccept[ing] signed leases and rental agreements from prospective tenants." (§ 10131.01, subd. (a)(3)(E).) That provision does not help Nijjar and Miller. Nijjar and Miller do not cite any evidence or authority suggesting the Four J's Park, a mobilehome park (see Health & Saf. Code, § 18214), qualifies as a residential apartment building, complex, or court. And even if it did, subdivision (a)(3)(E) exempts only the employee of a property

24

states: "No real estate broker who engages in the activities authorized by this section [i.e., selling or offering to sell a mobilehome] shall maintain any place of business where two or more manufactured homes or mobilehomes are displayed and offered for sale by the person, unless the broker is also licensed as a mobilehome dealer" by the HCD. Ruiz testified, and Miller admitted, Nijjar did not have a license issued by the HCD. And as discussed, Rodriguez acted on behalf of Nijjar when executing the lease-to-own agreements.

We asked the parties under Government Code section 68081 to submit supplemental briefing on "whether Nijjar violated the applicable provisions of the Business and Professions Code because [it] "'offered for sale' . . . two or more mobile homes, even if [it] did not sell two or more mobile homes." In response, Nijjar and Miller did not dispute that Nijjar offered to sell mobilehomes or that the Department only had to show Nijjar offered to sell mobilehomes (as opposed to actually selling them) to establish the violations. Instead, Nijjar argued it did not violate section 10131.6, subdivision (b), because it did not "maintain a place of business" at the Four J's Park.

There was substantial evidence, however, Nijjar maintained a place of business at the park for purposes of section 10131, subdivision (b). The trial court found Nijjar "operate[d] and manag[ed]" the park. Nijjar and Miller do not explain why operating and managing a mobilehome park would not constitute maintaining a place of business for purposes of the statute. Moreover, the legislative history reflects that the purpose of section 10131.6, subdivision (b), was to limit the circumstances in

manager accepting leases—not someone who is also offering to sell property.

25

which a broker could offer multiple mobilehomes for sale. The Legislative Analyst's Analysis of Assembly Bill No. 2194—the Bill that enacted section 10131 (see Stats.1974, ch. 1351, § 1)— explained that, at the time, the existing law required "a person selling mobilehomes [to] obtain a vehicle dealer's license and establish a place of business." (Legis. Analyst, analysis of Assem. Bill No. 2194 (1973-1974 Reg. Sess.) p. 86.) According to the analysis, the bill "would authorize a real estate broker to engage in the sale or purchase of certain mobilehomes which have been registered with the Department of Motor Vehicles . . . without having first obtained a vehicle dealer's license," but the "real estate broker would not be permitted to display more than one mobilehome for sale unless he is a licensed vehicle dealer." (*Ibid*.) To allow Nijjar to offer for sale multiple mobilehomes at the same park, which Nijjar also operated and managed, would be inconsistent with the purposes of section 10131 of allowing a broker to sell a mobilehome, but not multiple ones at the same time and place. (See *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 442 [views of the Legislative Analyst "are both judicially noticeable and at times persuasive indications of the Legislature's views" (italics omitted)].)

Nijjar and Miller argue that, in interpreting "place of business" in section 10131, subdivision (b), we should adopt the definition of "established place of business" under the Manufactured Housing Act of 1980, the law that governs mobilehome dealers. (See Health & Saf. Code, § 18000 et seq.) In order to obtain a mobilehome dealer license, a person must have an "established place of business," which the Act defines as "the place actually occupied, either continuously or at regular

26

periods, by a licensee, where the books and records pertinent to the type of business being conducted are kept." (*Id.*, § 18003.6; see § 18045.5.) Nijjar and Miller's argument is not persuasive. By prohibiting a real estate broker from maintaining "any" place of business where two or more mobilehomes are offered for sale, the Legislature did not intend to prohibit a broker only from selling mobilehomes at the place where the broker's books and records are kept. To accept Nijjar and Miller's contention would effectively allow a broker to operate a mobilehome dealership but avoid the licensing requirements of the Manufactured Housing Act simply by keeping its books and record offsite.[8]

Finally, even if Nijjar did not violate section 10131.6, subdivision (b), reversal is not warranted because it is not reasonably probable the Department would not have revoked Nijjar's and Miller's licenses absent the administrative law judge's determination Nijjar violated that particular statute. The administrative law judge (and the trial court) found Nijjar violated both section 10131.6, subdivision (b), and section 10137 by employing Rodriguez to enter into the lease-to-own agreements. Even if Nijjar's conduct did not violate section 10131.6, subdivision (b) (because, under Nijjar and Miller's theory, Nijjar did not maintain a place of business where it offered to sell multiple mobilehomes), Nijjar, as discussed, still violated section 10137, the statute that prohibits a licensee from retaining and compensating an unlicensed person to perform an activity for which a license is required. (See *Saad v. City of Berkely* (1994) 24 Cal.App.4th 1206, 1215 [where a city supported its decision to deny a permit based on three findings, the permit

---

[8] Moreover, by managing and operating the park through Rodriguez, Nijjar "actually occupied" the park at regular periods.

27

applicant could not demonstrate a prejudicial abuse of discretion by showing the city erred in one of the findings, "[u]nless the findings [were] so intertwined that a failure of one could reasonably lead the City to reconsider its denial"].)

   3. *Substantial Evidence Supported the Trial Court's Finding Nijjar Violated the Health and Safety Code*

Section 10176, subdivision (m), provides that the commissioner may revoke a license if the licensee "[v]iolat[es] any section, division, or article of law which provides that a violation of that section, division, or article of law by a licensed person is a violation of that person's licensing law, if it occurs within the scope of that person's duties as a licensee . . . ." The trial court found there was sufficient cause to revoke Nijjar' and Miller's licenses under section 10176, subdivision (m), because Nijjar violated Health and Safety Code, section 18550, subdivision (a), as well as various HCD regulations, by allowing tenants to occupy mobilehomes that were not permitted for human occupancy. Substantial evidence supported the trial court's findings.

Health and Safety Code section 18550, subdivision (a), provides: "It is unlawful for any person to . . . cause, or permit to be used for occupancy" any mobilehome "supplied with fuel, gas, water, electricity, or sewage connections, unless the connections and installations conform to regulations" of the HCD. The HCD's regulations are in Title 25 of the California Code of Regulations and, as relevant here, require the Department to inspect and approve any such fuel, gas, water, electricity, or sewage installations before a mobilehome may be used for occupancy.

28

Section 1324 of title 25 provides a "permit shall be obtained from the enforcement agency each time a [mobilehome] unit is located . . . on any site for the purpose of human habitation." (Cal. Code Regs., tit. 25, § 1324, subd. (a).) Section 1326 of the regulations provides that, after issuing the permit, the Department must inspect and approve the installation of the mobilehome, and the mobilehome "shall not be occupied for human habitation prior to inspection and approval of the installation." (*Id.*, tit. 25, § 1326, subds. (a), (e)). To approve the installation and permit human habitation, the Department must also approve the mobilehome's "utility facilities"; i.e., the fuel, gas, water, electricity, or sewage connections. (*Id.*, tit. 25, § 1328; see also *id.*, §§ 1352-1358.)

There was substantial evidence Nijjar "cause[d], or permit[ted] to be used for occupancy," a mobilehome supplied with utility facilities the Department had not approved. Martinez testified he was "the inspector for the area that would have inspected any homes installed" at the Four J's Park. He testified that the park obtained a permit to install electrical infrastructure before any mobilehomes were installed, but that no one had applied for human occupancy permits for any of the mobilehomes. Martinez also testified there appeared to be "somebody living" in each of the seven mobilehomes he observed.

Nijjar and Miller contend that only the owner of the park or mobilehomes can be liable for allowing tenants to occupy the homes without the required permits and approvals. The trial court correctly ruled, however, Health and Safety Code section 18550 contains no such limitation. Health and Safety Code section 18550 states it is unlawful for "any person," not just a park owner, to "cause, or permit to be used for occupancy," a mobilehome without the required approvals. Nijjar caused and

29

permitted the units to be used for occupancy because Rodriguez, acting on behalf of Nijjar, provided the keys to the mobilehomes to the tenants/buyers and entered into lease-to-own agreements with them.

The legislative history confirms persons other than the owner of the mobilehome or park may be liable for violating Health and Safety Code section 18550. Health and Safety Code section 18550 was previously codified at section 18250. (See Health & Saf. Code, former § 18250, added by Stats. 1961, ch. 2176, § 2, p. 4508, and reenacted and renumbered by Stats. 1973, ch. 1103, § 7, p. 2247.) Before the Legislature renumbered the statute, Health and Safety Code section 18250 provided it was unlawful "for any person *in a mobilehome or mobilehome park* to use or cause, or permit to be used for occupancy" a mobilehome that did not comply with various regulations. (See Health & Saf. Code, former § 18250, subds. (b), (g), as amended by Stats. 1963, ch. 2020, §1, p. 4142, italics added.) When in 1973 the Legislature renumbered section 18250 as section 18550, it removed the words "*in a mobilehome or mobilehome park*" from the statute, so that the statute simply provided (as it does now) that it was unlawful for any person—not only a person in a mobilehome or mobilehome park—to cause or permit to be used for occupancy a mobilehome that did not comply with the applicable regulations. (See Health & Saf. Code, § 18550, as enacted by Stats. 1973, ch. 1103, § 7, p. 2247.) The Legislative Counsel's summary of section Senate Bill No. 262—the bill that amended and renumbered former section 18250 as section 18550—confirmed that the intent of the amendment was to expand the scope of persons liable for violating the statute beyond only persons in the mobilehome park or mobilehome.

30

(See Legis. Counsel's Dig., Sen Bill No. 262 (1973-74 Reg. Sess.) Summary Dig., pp. 172-173 [the amendment "[m]akes it unlawful for any person to use or cause, or permit to be used for occupancy, certain prescribed mobilehomes wherever located, rather than for any person in a mobillehome to use or cause, or permit to be used for occupancy certain prescribed mobilehomes"].)  By expanding the scope of liability from only persons in the mobilehome or mobilehome park to "any person," the Legislature could not, as Nijjar and Miller assert, have intended to restrict liability to only mobilehome or mobilehome park owners.

Moreover, even if there were some limitation on who may be liable under section Health and Safety Code 18550, such a limitation would not apply to Nijjar.  Health and Safety Code section 18420 provides that, if the HCD determines "a mobilehome park is in violation of any provision" of the Health and Safety Code governing mobilehomes, the HCD shall issue a notice to correct the violation "to the owner or operator of the mobilehome park and to the responsible person, as defined in [Health and Safety Code] Section 18603."  Health and Safety Code section 18603, in turn, defines the responsible person as the person available to respond to emergencies concerning "the operation and maintenance of the park."

The trial court found Nijjar was "operating" the park. Substantial evidence supported that finding, or at least a finding Nijjar was acting as a responsible person.  Martinez testified that Nijjar was the manager of the park when he inspected it in January 2016 and that he communicated with Nijjar about the permit violations.  When Jediny inspected the park in February 2016, Rodriguez identified himself as the manager.  Miller admitted that one of Nijjar's employees (though not Rodriguez)

31

was "in charge of the operations" of the park.  And, although Cobra 28 No. 7, not Nijjar, held the permit to operate the park, Nijjar was leasing spaces in the park—one of the activities only the licensed operator may perform.  (See Health & Saf. Code, § 18500, subd. (c); Cal. Code Regs., tit. 25, § 1106.5.)

## DISPOSITION

The judgment is affirmed.  The Department is to recover its costs on appeal.


SEGAL, J.


We concur:



PERLUSS, P. J.



FEUER, J.